697 So.2d 1040 (1997)
STATE of Louisiana
v.
Marty James HEBERT.
No. 96 KA 1884.
Court of Appeal of Louisiana, First Circuit.
June 20, 1997.
*1042 J. Phil Haney, Franklin, for Appellee State.
Craig Colwart, Franklin, for Defendant-Appellant Marty James Hebert.
Before WHIPPLE and FITZSIMMONS, JJ., and TYSON, J. Pro Tem.[1]
WHIPPLE, Judge.
Defendant, Marty James Hebert, was charged by grand jury indictment with second degree murder, a violation of LSA-R.S. 14:30.1. Defendant pled not guilty, was tried by a jury, and was found guilty as charged. The trial court sentenced defendant to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. Defendant has appealed, urging three assignments of error.[2]
The body of the victim, Carl Dean Theriot, Jr., was found on April 20, 1994, on Highway 87, a rural road in Franklin, Louisiana, in St. Mary Parish, approximately 3.7 miles from the courthouse. The victim had been shot three times in the left side of his head in the late evening of April 19, 1994 or the early morning of April 20, 1994. Following a lengthy investigation, culminating in the discovery at the home of defendant and his parents of a .38 caliber 5 shot Rossi handgun later determined to be the weapon that fired the shots, defendant confessed that he shot the victim.

TRIAL TESTIMONY
Testimony at trial revealed the following. When defendant was initially questioned by the police on April 21, 1994, regarding the murder, he told them the last time he had seen or talked to the victim, who had been his friend, was on April 10, 1994. He also told them that he owned no weapons other *1043 than a shotgun, and, when asked whether he had any information about a suspect in the murder, he told them about some "black guys" for whom the victim was dealing drugs.
The police investigation focused on defendant after defendant's former girlfriend and other friends informed the police of threats defendant had made against the victim. Tava Deslatte, defendant's former girlfriend, told the police that defendant and the victim got into a fight in January, 1994, at her house. According to Tava, although she and the victim were only friends, defendant believed their relationship was more involved. Tava testified that two weeks before the victim was killed, defendant brought her near the area where the victim's body was later found, took out a gun and loaded it, and threatened her, telling her that if he could not have her, no one could. Defendant then told her he was going to kill himself and went into the woods. Tava went to find him, and he threw the gun away in the woods.
On April 19, 1994, at around 9:00 or 9:15 p.m., Tava spoke to defendant on the phone, and he told her "he had to kill somebody." When she asked whom, he eventually named the victim and said the victim "knew too much about him" and "was threatening to go to the cops with it." She tried to talk defendant out of what he planned to do, and he agreed to talk to the victim. Defendant told Tava he was going to get something to eat and would call her when he returned. Tava then attempted to call the victim, but she did not reach him. Defendant called Tava at 10:00 p.m. and told her to forget what he had said earlier. She testified that after the murder, defendant swore to her that he had not killed the victim. However, he did tell her that he had gone to the victim's house, but claimed that the victim was not there. Defendant told Tava not to tell the police anything.
Weldon Daigle, a friend of both the victim and defendant, told the police that defendant was at his house on April 19, 1994, and they discussed the victim. According to Weldon, defendant told him, referring to the victim, "I am going to kill that mother ______.... I am going to get some black guys at work to do it."
Tava's mother, Karen McGoff, testified that defendant was very jealous of the victim, and that the jealousy intensified to the point that defendant would call Tava's mother and ask her to check their caller identification box to see if the victim had called Tava. On one occasion, when Tava's mother told defendant that there were no calls on the caller identification box (possibly indicating that Tava had erased it), defendant called Tava, who was with her father, and used an emergency breakthrough to interrupt an ongoing phone conversation to discuss with Tava whether the victim had called. Tava's mother testified that after the victim's death, she informed defendant and Tava of her concern that the person who killed the victim would come after them because the killer thought they knew who did it. Defendant responded, "We don't have to worry about that."
Eric Mire, another friend of the victim and defendant, testified that after January, 1994, defendant often told him he wanted to "kick his [the victim's] ass." Eric testified that on April 19, 1994, defendant said he was "gonna get him," referring to the victim, that night. Eric tried to call the victim to warn him, but was unable to talk to him. Eric testified that defendant called him between 12:30 and 1:00 a.m. on April 20, 1994, and asked Eric if he had called defendant's house that night. Eric replied that he had, and defendant told Eric he had woken him up. Eric testified that the call was unusual because they hardly ever talked on the phone.
Kristie Pontiff, a friend of defendant, testified that she talked to defendant about a week before the victim's death, and defendant told her that he and the victim got into a fight that day, but "he wasn't worried about it because Dean was about to be killed." Jason Hebert, another friend of defendant, testified that defendant talked about doing something to the victim "all the time" and that it was "like an obsession." Jerry Favors, a cellmate with defendant after his arrest for the victim's murder, testified that defendant told him he killed his friend "over a girl." According to Jerry, defendant said *1044 that he and the victim were arguing and he shot the victim three times.
After the police discovered the gun, defendant told them in a statement on July 4, 1995, that a month or so before the victim's death, Tava called him because the victim was at her house and would not leave. Defendant went to Tava's house. According to defendant, the victim tried to hit him with a bottle, so defendant "beat him up right there and called the police and everything." Defendant stated he did not speak to the victim for two or three weeks. Defendant also stated that he and the victim were friends with Jason and Eric, and all of them were "bad-mouthing" the victim. Defendant stated that on the day of the shooting, he went to Weldon's house to buy some marijuana, and they began discussing how the victim owed Jason money and again began "bad-mouthing" the victim. According to defendant, he told Weldon he was "going to get him again," referring to the victim. Defendant said that he was not insinuating he was planning to murder the victim, but he was talking "out of anger."
In his statement, defendant said that later that night, after talking to Tava on the phone and going to a McDonald's restaurant, he picked the victim up from his house and they drove around, smoking marijuana. He stopped the truck so they could shoot the gun. Defendant described what the victim was doing with the gun prior to shooting himself. According to defendant, one bullet was left in the gun. The victim was "spinning the chamber and he was cocking the hammer back like he was playing Russian roulette and he kept doing that" until the gun went off, shooting him in the head. Defendant was "high" and scared, and did not think he could explain what had happened, so "right after [the victim] shot," he picked up the gun, reloaded it, and shot the victim twice in the head to make it look like he was robbed. Defendant also indicated that the gun was in the victim's left hand. Defendant told the police in his statement that he picked up the casings and returned home, later putting the gun back under his father's bed. Defendant denied talking with Tava about the victim on the telephone prior to the shooting, although he admitted telling her not to talk to the police afterwards. In his statement, defendant said that the victim did not shoot himself on purpose.
The State presented testimony at trial that the victim's use of his left hand was impaired due to an accident, and that he mostly used his right hand. At trial, a police detective also was asked to cock defendant's father's gun back and spin the chamber, as defendant claimed the victim was doing when the gun went off, but the detective was unable to do so in the manner described by defendant. The State also presented the testimony of Dr. Emil Laga, the doctor who performed the autopsy on the victim. He testified that the fatal shot to the victim's head was inflicted at close range, and there was no gunpowder or blood or tissue matter on the victim's left hand, which would be present if the victim had fired the gun. (The police officers investigating the crime who viewed the victim's body when it was found also testified that the victim's left hand contained no such residue or substances.) The doctor further testified that the other two shots were fired from over two feet away from the victim. The doctor testified that in his opinion, the victim could not have fired the three shots.
The defense elicited testimony on cross-examination of Tava that the victim told her once that he wanted to kill himself. The defense also presented testimony from Lionel Clark, another cellmate who was with defendant and Jerry Favors after defendant's arrest. Lionel testified that defendant never confessed to Jerry that he had killed the victim. Another defense witness, Candace Sweanor, the victim's girlfriend, testified that the victim's "main topic of conversation" was committing suicide.

ASSIGNMENT OF ERROR NO. 1
In assignment of error number 1, defendant contends the court erred by denying defense counsel's motion for a mistrial due to the prosecutor's alleged reference in closing argument to defendant's failure to testify, in violation of LSA-C.Cr.P. art. 770(3). Defendant relies on the jurisprudence which holds that when a defendant is the only person who can refute the state's evidence, *1045 an indirect reference to the defendant's failure to testify is reversible error, citing State v. Johnson, 541 So.2d 818 (La.1989) and State v. Harvill, 403 So.2d 706 (La.1981). Defendant contends that, during the prosecutor's rebuttal closing argument, while walking past the witness stand and turning toward defendant, the prosecutor referred to the July 4, 1995, statement made by defendant to police. The prosecutor commented that defendant's statement was not made under oath. Thus, defendant argues, because any testimony at trial by defendant would be given under oath, the prosecutor indirectly referred to defendant's failure to testify.
Prior to the prosecutor's rebuttal, in defense counsel's closing argument, he commented that the only evidence of what happened to the victim consisted of defendant's statements made to the police and various other people. In his rebuttal argument, the prosecutor responded to defense counsel's argument that defendant's last statement to the police (the July 4, 1995 statement) should be believed as opposed to the testimony of witnesses who testified at trial under oath that defendant told them he intended to kill the victim. The statements about which defendant complains, taken in context, are as follows:
I am a little bit confused by [defense counsel's] argument. You can't have it both ways. It is man [sic] slaughter, it is accident, it is the Police messed up. It's everything but the truth. The defendant wants it every way but the true way. That's what he wants. That's what all his statements were all about.
Just keep in mind[defense counsel] was talking about ... [defendant's] statements and the one of July 4th, that's the one you want to believe. It is not under oath. It wasn't sworn to. The defendant could say anything he wanted to. Keep that in mind as you listen to Mr. Colwart's argument, think about it.
Immediately following these comments, defense counsel objected, and, at a bench conference, moved for a mistrial, which was overruled by the trial court. Defense counsel asked the trial court to give an admonition. However, the trial court refused.
Louisiana Code of Criminal Procedure article 770(3) states, in pertinent part:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
* * * * * *
(3) The failure of the defendant to testify in his own defense; ...
Where the reference to the failure of defendant to take the stand is direct, a mistrial should be declared, and it is irrelevant whether the prosecutor intended for the jury to draw unfavorable inferences from defendant's silence. State v. Johnson, 541 So.2d at 822; State v. Handley, 96-0631, p. 12 (La.App. 1st Cir. 12/20/96), 686 So.2d 149, 157. However, where the reference is not direct, a mistrial is required only if the court determines the comment was intended to draw the jury's attention to a defendant's failure to testify. State v. Hamilton, 92-1919, p. 12 (La.9/5/96), 681 So.2d 1217, 1225. In cases where the prosecutor simply emphasizes that the state's evidence is unrebutted, and there are witnesses other than defendant who could have testified for the defense but did not do so, the prosecutor's argument does not constitute an indirect reference to defendant's failure to testify. On the other hand, where the defendant is the only witness who could have rebutted the state's evidence, a mistrial is mandated where the prosecutor refers to the testimony as uncontroverted. State v. Bourque, 622 So.2d 198, 240 (La. 1993); State v. Handley, 96-0631 at p. 12, 686 So.2d at 157.
In this case, we find that the prosecutor's comments challenged by defendant did not constitute direct or indirect references to defendant's failure to take the stand. The prosecutor was entitled to point out that defendant's statement was not given under oath. In his closing argument, defense counsel had accused some of the state's witnesses of lying. Therefore, the prosecutor was attempting to compare and contrast the *1046 state's evidence given by witnesses under oath with the unsworn statement of defendant. The comment was not intended to draw the jury's attention to defendant's failure to testify. See State v. Robinson, 563 So.2d 477, 484-485 (La.App. 1st Cir.), writ denied, 567 So.2d 1122 (La.1990).
Moreover, defendant was not the only person who could have testified to his version of what happened that night, and the prosecutor's comment on the unsworn statement could not be characterized as an effort to call the jury's attention to the failure of defendant to testify in his own defense.[3]See State v. Robinson, 563 So.2d at 485. Other witnesses could have been called to testify whether the victim could have handled the gun in the fashion described by defendant, such as defendant's father, the owner of the gun. Additionally, Candace, a girlfriend of the victim, testified that he discussed suicide with her on several occasions. On cross-examination, Tava also testified that the victim once told her he wanted to kill himself. Accordingly, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 2
In assignment of error number 2, defendant contends the trial court erred by denying the defense's motion to suppress evidence of the gun that was seized pursuant to a search warrant. Defendant contends that the information in the affidavit for the search warrant used to establish that the gun sought by police would be found in defendant's residence was stale. Staleness exists when the passage of time makes it doubtful that the object sought in the warrant will still be found on the premises to be searched. State v. Tate, 407 So.2d 1133, 1137 (La.1981). See also State v. Ogden, 391 So.2d 434, 437 (La.1980).
The search warrant in this case was for a search of the residence occupied by defendant and any vehicles owned or occupied by the occupants of the residence. The affidavit supporting the warrant states that a .38/.357 Magnum caliber weapon and ammunition and shell casings from that weapon were believed to be in those locations. The affiant is Detective Mark Hebert and the affidavit sets forth the basis of probable cause as follows. The affidavit states that a homicide occurred on April 20, 1994, and an autopsy was performed on April 20, 1994, in which it was determined that the victim received three gunshot wounds. According to the affidavit, two of the bullets were recovered at the autopsy and the third was recovered at the crime scene. The affidavit states that on April 20, 1994, the bullets were delivered to the crime lab. The lab determined that the bullets were all fired from the same weapon, a .38/.357 Magnum caliber weapon.
The affidavit continues by stating that on April 25, 1994, detectives interviewed Weldon, who advised them that on April 19, 1994, defendant told Weldon that he and the victim had been in a fight over Tava, defendant's girlfriend. According to Weldon, defendant told him he was going to kill the victim, then said he was going to get some "black dude" to do it. On February 8, 1995, a detective interviewed defendant. Defendant told the detective that one month before the victim's death, he and the victim had been in a fight. Defendant was asked whether his father had a gun and he stated that he believed his father did have a handgun, but he was not sure what kind of gun it was.
The affidavit further states that on February 15, 1995, Detective Steve Clark of the St. Mary Parish Sheriff's Office interviewed Tava, who advised the detective that she spoke to defendant on the phone on the night the victim died. Tava told Detective Clark *1047 that defendant said he was going to kill the victim because the victim knew too much about him and had threatened to go to the police. The affidavit states that on February 16, 1995, detectives interviewed Jason Hebert, who told them that he had seen a .38 caliber handgun belonging to defendant's mother. Jason stated that the last time he saw the gun was about one and one-half to two years before the interview. Jason indicated that he had seen defendant in possession of the gun before, when defendant shot the gun at his house at an animal. Jason did not know the brand name of the gun. The affidavit was executed on June 5, 1995, and the warrant was issued on the same date.
At the hearing on the motion to suppress, Detective Mark Hebert of the St. Mary Parish Sheriff's Office testified that when he went to defendant's father's home, defendant's father recovered the Rossi .38 revolver from a drawer underneath his bed. His wife recovered another revolver from a night stand in a rear bedroom. According to the detective, defendant's father indicated to him that he was willing to voluntarily retrieve the weapons he had in his home, and defendant's father did produce them for him.[4] Detective Steve Clark was also questioned, and he testified that he never received a report that the weapon the police believed defendant's parents had in their home had been removed, stolen, or lost.
The court issued written reasons to support its denial of the motion to suppress. Relying on federal cases only, the court found defendant had no standing because he had no privacy interest in his parents' residence or weapon. The court additionally found that the information supporting the warrant was not stale and noted defendant's parents' actions in voluntarily retrieving the weapons.
Under La. Const. art. I, § 5, as interpreted by the Louisiana Supreme Court, any person adversely affected by a search or seizure allegedly conducted in violation of Article I, Sec. 5, has standing to raise that illegality. There is no equivalent under Louisiana constitutional law to the federal rule that one may not raise the violation of a third person's constitutional rights. State v. Hamilton, 572 So.2d 269, 272 n. 1 (La.App. 1st Cir.1990), writ denied, 578 So.2d 929 (La. 1991). Thus, defendant has standing to raise the claim that the search of his father's home was illegal. See State v. Hamilton, 572 So.2d at 272 n. 1.
A search warrant may issue only upon probable cause established to the satisfaction of the judge, by the affidavit of a credible person, reciting facts establishing the cause for issuance of the warrant. La. Const. art. I, § 5; LSA-C.Cr.P. art. 162. Probable cause exists when the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient to support a reasonable belief that an offense has been committed and that evidence or contraband may be found at the place to be searched. State v. Lazarus, 633 So.2d 225, 229 (La.App. 1st Cir.1993). The concept of probable cause includes a reasonable belief that the evidence sought by the prospective search will not have been disposed of, but will remain at the place to be searched at the time of the proposed search. State v. Lewis, 385 So.2d 226, 229 (La.1980). The probable cause standard is a practical, nontechnical conception. Only the probability, and not a prima facie showing, of criminal activity is required. A magistrate's determination of probable cause should be paid great deference by reviewing courts. Illinois v. Gates, 462 U.S. 213, 236-237, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983); State v. Lazarus, 633 So.2d at 229.
A magistrate must decide whether an affidavit reveals a fair probability that contraband will be found at a particular location. See State v. Kyles, 513 So.2d 265, 271 *1048 (La.1987), cert. denied, 486 U.S. 1027, 108 S.Ct. 2005, 100 L.Ed.2d 236 (1988); State v. Lazarus, 633 So.2d at 229. The affidavit, interpreted in a common sense and realistic manner, must contain information which would warrant a person of reasonable caution to believe the articles sought are located at the place to be searched. State v. Lazarus, 633 So.2d at 229.
The affidavit supporting the warrant should stand for itself and should contain all information necessary for issuance of the warrant. Normally a reviewing court is not permitted to go outside the "four corners" of the affidavit; the only exception is where there are inadvertent material omissions in the affidavit. See State v. Morris, 444 So.2d 1200, 1202 (La.1984). As a general rule, testimony during a motion to suppress hearing can be examined by a reviewing court determining whether suppression should have been ordered, but it cannot supplement the affidavit. State v. Lazarus, 633 So.2d at 229.
As earlier stated, staleness exists where the passage of time makes it doubtful that the object sought in the warrant will still be found on the premises to be searched. The gun in this case is not a consumable item such as narcotics, which would not be expected to remain on the premises nearly fourteen months after the offense. See State v. Deal, 578 So.2d 994, 995-996 (La.App. 4th Cir.), writ denied, 580 So.2d 677 (La.1991). Additionally, the fact that the gun belonged to defendant's father and not defendant made it more likely that it was in the residence. On February 8, 1995, only four months before the warrant was executed, defendant told detectives he believed his father had a handgun. On February 16, 1995, Jason told detectives he had seen a .38 caliber handgun belonging to defendant's mother. These facts support a reasonable belief that the gun would still be at the house to be searched, and the determination that there was probable cause was not in error.
Moreover even assuming arguendo that the affidavit was stale, the good faith exception of United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), is applicable. In Leon, the United States Supreme Court held the exclusionary rule should not be applied so as to bar the use, in the prosecution's case-in-chief, of evidence obtained by officers acting in an objectively reasonable good faith reliance on a search warrant issued by a detached and neutral magistrate, but ultimately found to be invalid. The Leon court enumerated four instances in which suppression remains an appropriate remedy: (1) where the magistrate or judge was misled by information the affiant knew was false or would have known was false except for a reckless disregard for the truth; (2) where the issuing magistrate wholly abandoned his detached and neutral judicial role; (3) where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the warrant is so facially deficient, i.e., fails to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonably presume it to be valid. United States v. Leon, 468 U.S. at 923, 104 S.Ct. at 3421; State v. Lazarus, 633 So.2d at 229-230. None of the Leon exceptions apply herein. There is no showing that the affiant's information was stale or that there was bad faith. Thus, this assignment of error also lacks merit.

ASSIGNMENT OF ERROR NO. 3
In assignment of error number 3, defendant contends the court erred by allowing the introduction of allegedly gruesome autopsy photographs into evidence. At trial, defendant objected to Exhibits S-6, S-10, and S-11, all of which were autopsy photographs. Defendant objected to that portion of the photographs depicting the victim's body from the neck down because the photographs showed the victim's open chest cavity.[5] The court overruled the objection. Before *1049 allowing the photographs at issue to be introduced into evidence, the court informed the jury:
I want to explain to the jury that these photographs were taken during the autopsy.
I assume that everyone understands what an autopsy is. An autopsy is a procedure where the coroner or the pathologist has to dissect parts of the body in order to retrieve organs and check those organs to determine if there has been any effect on the organs, as a result of the death or if the death was caused by something in the organs and so forth. So the pathologist has to examine the interior organs in the body. Of course to do that, you have to cut open the chest. These photographs reflect that and this is a normal autopsy.
So in viewing the photographs, understand that the open chest and the open cavity of the body was not something that was done in the incident on which we are on trial here.
The reflections on the head are where it is going to appear on the photographs that the head has the place of entry of the three projectiles. That is the only part of the picture that is really relevant for purposes of the killing or the alleged killing.
I give you that so you will be aware and not believe or think that the other portions of the autopsy, the chest and so forth, has anything to do with the actual shooting.
Louisiana Code of Evidence article 401 provides: "`Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Louisiana Code of Evidence article 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."
Photographs which illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place, or thing depicted, are generally admissible, provided their probative value outweighs any prejudicial effect. State v. Mitchell, 94-2078, p. 9 (La.5/21/96), 674 So.2d 250, 257, cert. denied, ___ U.S. ___, 117 S.Ct. 614, 136 L.Ed.2d 538 (1996); State v. Steward, 95-1693, p. 5 (La.App. 1st Cir. 9/27/96), 681 So.2d 1007, 1011. Postmortem photographs of murder victims are admissible to prove corpus delicti, to provide positive identification of the victim, and to corroborate other evidence establishing the cause of death, the manner in which death occurred, and the location, severity, and number of wounds. State v. Mitchell, 94-2078, p. 9, 674 So.2d at 257; State v. Huls, 95-0541, p. 24 (La.App. 1st Cir. 5/29/96), 676 So.2d 160, 176, writ denied, 96-1734 (La.1/6/97), 685 So.2d 126. Gruesomeness of photographs does not, in and of itself, prevent admissibility. See State v. Bourque, 622 So.2d at 236; State v. Huls, 95-0541 at p. 24, 676 So.2d at 176. The trial court's admission of allegedly gruesome photographs will be overturned on appeal only if the prejudicial effect of the photographs clearly outweighs their probative value. No error will be found unless the photographic evidence is so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence. State v. Perry, 502 So.2d 543, 559 (La.1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987); State v. Steward, 95-1693 at p. 5, 681 So.2d at 1011.
In this case, Exhibits S-6, S-10, and S-11 separately show the three gunshot wounds with the paths of the bullets marked by forceps inserted into the wounds. These photographs depict the nature and extent of the injuries recited by the victim during the commission of this crime and support Dr. Laga's testimony as to which of the three *1050 wounds was the fatal wound, based on his determination of the path of the bullets as illustrated by the position of the forceps. According to Dr. Laga, the third entry wound shown by Exhibit S-11 was the fatal wound and was inflicted with the gun at less than two feet away from the victim or in contact with the victim's face, as demonstrated by the presence of gunpowder residue, visible in the exhibit. Exhibits S-6 and S-10 also relate to Dr. Laga's testimony concerning the distance from which the shots were fired and the absence of gunpowder on the victim's face, facts upon which he based his opinion that the gunshots were not self-inflicted. Moreover, Dr. Laga explained at the beginning of his testimony that during an autopsy, the pathologist "open[s] up" the head cavity, chest cavity, and abdominal cavity to determine if anything abnormal appears inside those body cavities.
These photographs, with the views of the victim's open chest cavity, while unpleasant, are not unduly gruesome. The comments by the trial court prior to their introduction into evidence reduced the risk of prejudice. See State v. Mitchell, 94-2078 at p. 10, 674 So.2d at 257 n. 5. When we balance the probative value of the photographs with the likelihood the jury was inflamed simply upon viewing these exhibits, we find the probative value of the evidence outweighs the possible prejudicial effect. See State v. Tart, 93-0772, p. 29-30 (La.2/9/96), 672 So.2d 116, 145, cert. denied, ___ U.S. ___, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996); State v. Bourque, 622 So.2d at 236; State v. Young, 615 So.2d 948, 953 (La.App. 1st Cir.), writ denied, 620 So.2d 873 (La.1993). The trial court did not err in its ruling. This assignment of error lacks merit.

PATENT ERROR
Under the authority of LSA-C.Cr.P. art. 920(2), this court routinely reviews appellate records for patent error. After reviewing the record, we have discovered patent sentencing error caused by the trial court's failure to give defendant credit for time served. See LSA-C.Cr.P. art. 880. The sentencing transcript and the minute entry do not reflect that defendant was given such credit. Accordingly, we amend the sentence to reflect that defendant is to be given credit for time served prior to execution of the sentence. See State v. Greer, 572 So.2d 1166, 1172 (La.App. 1st Cir.1990). While we are aware that this sentence is for life without benefit of parole, probation, or suspension of sentence, we note and correct the failure to give credit for time served because this failure could make a difference if this sentence is ever considered for commutation and, if a decision is made to commute the sentence, the failure could also make a difference as to when the commutation should take effect. State v. King, 604 So.2d 661, 670 (La.App. 1st Cir.1992). Resentencing is not required. However, we remand the case and order the district court to amend the commitment and the minutes to reflect that defendant is to be given credit for time served.

CONCLUSION
For the foregoing reasons, defendant's assignments of error lack merit. Accordingly, defendant's conviction and sentence, as amended to indicate credit for time served, are affirmed.
CONVICTION AFFIRMED AND SENTENCE AFFIRMED, AS AMENDED; REMANDED WITH ORDER.
FITZSIMMONS, J., concurs and assigns additional reasons.
FITZSIMMONS, Judge, concurring with additional reasons.
The prosecutor referred specifically to defendant's statement to the police in response to defense counsel's argument highlighting that statement. The prosecutor noted that the statement was not made under an oath. Under the totality of the facts presented here, the prejudice to the defendant was not sufficient to demand a mistrial. Such may not always be the case. If reference had been made generally to defendant's failure to speak under oath, a mistrial would be mandatory, in my opinion. In this case, I respectfully concur.
NOTES
[1] The Honorable Ralph E. Tyson, Judge, 19th Judicial District Court, is serving as judge pro tempore by special designation of the Louisiana Supreme Court.
[2] The record does not contain any assignments of error. The assignments of error are taken from defendant's brief. Although defense counsel did not properly designate assignments of error as required by articles 844, 916(1), 916(5), and 920 of the Louisiana Code of Criminal Procedure for the issues to be properly before this Court, this Court is bound to review the errors assigned and argued in his brief in accordance with the Supreme Court's ruling in State v. Galliano, 94-2030, 94-2280 (La.1/6/95), 648 So.2d 911. See State v. Galliano, 93-1101, p. 6 (La.App. 1st Cir. 5/5/95), 655 So.2d 538, 542 n. 1.
[3] In State v. Johnson, 541 So.2d 818, 822-823 (La.1989), the prosecutor commented in closing rebuttal argument that no one took the stand or contradicted any of the statements the defendant had made to several people implicating himself in the crimes. The Supreme Court held that because the only person who could have contradicted the testimony of the state's witnesses about what the defendant told them was the defendant, a mistrial was warranted. In State v. Harvill, 403 So.2d 706, 710-711 (La.1981), the sole evidence which the state presented against defendant was his taped confession. In closing argument, the prosecutor referred to the unrebutted character of the state's evidence. The Supreme Court held that the comment warranted a mistrial because it was a reference to the failure of the defendant to testify in his own defense, as only the defendant could recant the confession.
[4] While defendant's father may have had the right to consent to a search of his house under State v. Revere, 572 So.2d 117, 130 (La.App. 1st Cir.1990), writ denied, 581 So.2d 703 (La.1991), this consent does not make the issue of staleness irrelevant. Although defendant's father voluntarily showed the detectives the gun located in his bedroom, he did so after being presented with the search warrant. Mere acquiescence to a claim of lawful authority does not establish free and voluntary consent to a search. State v. Nicholas, 94-1096, p. 3-4 (La.App. 1st Cir. 3/3/95), 652 So.2d 666, 667-668, writ denied, 95-0761 (La.6/23/95), 656 So.2d 1013.
[5] Defense counsel informed the court that he had blown up the State's photographs so as not to show that part of the body below the head, but the court commented that defense counsel's photographs did not show the head alone. The prosecutor commented that defense counsel's photographs also showed part of the chest cavity. After the court overruled his objection, defense counsel stated that he wanted to proffer his photographs. Although the court allowed the proffer, the record does not contain these photographs. Generally, only that which is in the record may be reviewed on appeal. See LSA-C.Cr.P. art. 914.1; State v. Vampran, 491 So.2d 1356, 1364 (La.App. 1st Cir.), writ denied, 496 So.2d 347 (La.1986). Nevertheless, because of our determination that the admission of the exhibits was proper, examination of defense counsel's proffered photographs is unnecessary.