708 So.2d 1169 (1998)
STATE of Louisiana
v.
Charles "Joe" HARRIS.
No. 97 KA 0537.
Court of Appeal of Louisiana, First Circuit.
February 20, 1998.
*1171 Doug Moreau, District Attorney, Brent Stockstill, Asst. District Attorney, Baton Rouge, for State-Appellee.
Alex W. Wall, Jr., Baton Rouge, for Defendant-Appellant.
Before LOTTINGER, C.J., and SHORTESS and FOGG, JJ.
FOGG, Judge.
The defendant, Charles "Joe" Harris, was charged by indictment with second degree murder, a violation of LSA-R.S. 14:30.1. The defendant pled not guilty, was tried by a jury, and was found guilty as charged. He was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. The defendant appeals, asserting nine assignments of error.[1]

FACTS
Pertinent testimony from trial was as follows. Henry Johnson testified that on Saturday, November 26, 1994, at approximately 1:30 or 2:00 p.m., he, the defendant (his boss), and the victim (a co-worker), had finished some foundation work and stopped at a store, where they bought some beer and two pints of whiskey. They then went to the victim's house and sat in the yard, drinking and talking, as they did daily. According to Mr. Johnson, they did not drink more on this day than usual. Mr. Johnson stated they would "get our little buzz" and then go their separate ways. Mr. Johnson testified that they did not get paid by the man who hired them for the work that they had done, so the defendant agreed to give him and the victim an $80 check, of which each would get $40. The defendant drove them to his house because his checkbook was there; the defendant had no problem driving. Mr. Johnson stated that at the defendant's house, they sat in the kitchen and had a couple of beers. Mr. Johnson also drank some of a fifth of whiskey and the defendant had a couple of sips. The men were talking and Mr. Johnson left to use the bathroom outside. As he was walking back into the house, he heard a shot. According to Mr. Johnson, before the shooting, all three of them were fighting as they did every day on and off the job, and they "cuss[ed] each other out." Mr. Johnson could not recall the defendant telling the victim to get out of his house, but, according to Mr. Johnson, the defendant had told him (Johnson) that before, and he paid the defendant *1172 no attention. According to Mr. Johnson, everything that day was typical. Mr. Johnson testified that neither he nor the defendant had a problem walking, talking, or performing any physical actions, and he described the defendant as "Normal. Just feeling good, like."
On cross-examination, Mr. Johnson testified that he had known the defendant and the victim for a year and a half. Mr. Johnson stated that, on the day of the shooting, the three men bought a twelve-pack of beer and two pints of whiskey from the store. Mr. Johnson testified that he was drinking the whiskey and the victim and the defendant were drinking the beer and taking sips of the whiskey. Mr. Johnson testified that the three men stopped to buy more liquor on the way to the defendant's house because they "wasn't [sic] quite there on that buzz." They bought another twelve-pack of beer, and the defendant had a fifth of whiskey at his house. When asked by the defense counsel if everyone was "feeling pretty good" when he left the house to go to the bathroom, Mr. Johnson testified, "Pretty good. I imagine so. I know I was. So I can't tell about their feelings." Mr. Johnson testified that he did not hear the victim tell the defendant he would not leave the house without his money, but Mr. Johnson also stated that all three men raised their voices to one another and argued about money every day. Mr. Johnson did hear the men cursing at one another.
Janice Smith, the victim's girlfriend, testified that the victim, the defendant, and "Chop Chop" (Johnson) came to her and the victim's house after finishing work between 1:30 and 2:30 p.m. She stated that the men drank beer and whiskey on the porch. She testified that the defendant was to pay the victim and Chop Chop each $40 by check and that they went to the defendant's house between 4:00 and 4:30 p.m. Ms. Smith testified that the defendant drove and he did not appear to have any difficulty driving away. According to Ms. Smith, the defendant's house was five to six minutes away. Ms. Smith also stated that the men drank and talked at her house "[a]ll the time," and that their behavior was normal that day. According to Ms. Smith, "they always fussed [argued]. The whole crew. It's normal."
On cross-examination, Ms. Smith testified that while they were sitting on her porch, the defendant and Chop Chop were each holding a pint of whiskey. According to Ms. Smith, the men normally did not drink two pints every day, but she also testified that their behavior on this day was normal.
Benjamin Eckels, the defendant's stepson, testified that when he returned home on the day of the offense, the defendant and the victim were in the kitchen drinking and arguing about money. He stated that he saw the defendant obtain a gun from his room. According to Benjamin, the defendant told the victim to get out of his house, and then the defendant shot into the ceiling, while the victim was sitting in a chair at the table. Benjamin testified that "[m]y step daddy [sic] he had kind of like moved back and like to the center of the kitchen table, he had like moved back, then he had staggered back and then Dave [the victim] had jumped up, my step daddy [sic] had shot him." Benjamin also stated that the victim tried to grab the gun. Benjamin testified that he did not see the victim with a weapon, and he stated that the defendant fired a third shot into the floor.
Benjamin could not recall the taped statement he had given to the police the night of the shooting. In the statement, Benjamin said that, after the first shot, the defendant "done hauled off and shot him [the victim] in his head." Benjamin stated that the defendant was standing and the victim was sitting in a chair at the kitchen table when the defendant shot him. According to Benjamin, the gun was a foot or a little over a foot away from the victim; Benjamin stated that the defendant aimed it above the victim's nose and he thought the defendant reached across the table to shoot.
On cross-examination, Benjamin testified that, after the defendant told the victim to get out of the house, the victim said that he was not leaving until he got his money and then stood up. Benjamin testified that the defendant did not walk over to the victim and put the gun to his head. After the shooting, *1173 the defendant told another son to call 911, and he unloaded the gun.
Demetric Harris, the defendant's son, testified that when he returned home on the day of the shooting, the defendant was at the kitchen table with the victim and Chop Chop and they were arguing about money. Demetric testified that they argued every once in awhile. His father went into the bedroom and got a gun. According to Demetric, his father fired a warning shot into the ceiling and then asked the victim, who was sitting, to leave his house. Demetric testified that the victim "made a motion towards my dad like a leaning motion to hit him or grab the gun, or reach at him." Demetric stated that the defendant "leaned back like falling back to deflect it" and the gun went off. Demetric testified that the defendant fired a third shot into the floor. The defendant then asked Demetric to call 911. Demetric testified that the victim had no weapons and that there was no physical contact between the defendant and the victim.
When asked by the prosecutor, Demetric could not recall the taped statement he had made to the police on the night of the shooting. In the taped statement, which was played to the jury, Demetric said he heard the victim tell the defendant he did not want to fight him. Demetric also stated that the victim "was just getting up" from his chair at the kitchen table when the defendant shot him. Demetric testified that the defendant was about three feet away from the victim when he shot him. Demetric stated that the victim did not fight with the defendant over the gun.
On cross-examination, Demetric testified that he had been in the house five or ten minutes before the defendant got the gun. According to Demetric, the defendant and the victim were arguing heatedly, and it was obvious to Demetric that his father had been drinking and was intoxicated. Demetric stated that his father asked the victim to leave the house several times, but the victim told the defendant he would not leave until he got his money.
On redirect examination, Demetric testified that on the day of the shooting, he never saw the defendant fall down but did see him stumble when the police took him to the car. Demetric also agreed that the victim told the defendant he did not want to fight him prior to being shot. Demetric testified that the victim was shot when he stood up, after the defendant had told him to leave.
G.W. Lomax, a Baton Rouge city police officer, testified that he was the first officer upon the scene after the shooting. Sergeant Lomax arrested the defendant, handcuffing him and escorting him out of the house. Sergeant Lomax testified that the defendant seemed to understand all of his commands and followed them without any problem. Sergeant Lomax stated that the defendant had an odor of alcohol on him and was excited and nervous, but he did not fall down or stagger.
On cross-examination, Sergeant Lomax testified that he was dispatched at 4:46 p.m. and arrived at the house a minute and a half later. Sergeant Lomax indicated that the defendant's eyes were bloodshot and he had a strong odor of alcohol on his breath. He admitted that the defendant was intoxicated.
Rochelle Harris, the defendant's daughter, testified that she was in another room while the defendant and the victim were arguing. Rochelle testified that she tried to get out of the house because she saw the defendant fire the gun into the ceiling. According to Rochelle, before he fired the gun, the defendant told the victim to leave. She could not recall telling the police she saw the second shot.
On cross-examination, Rochelle testified that the information she gave to the police was based on what her brother had said, not what she had actually observed. Rochelle testified that she could tell her father had been drinking by his walk and slurred speech; she also could smell the alcohol.
On redirect examination, Rochelle testified that her father ordinarily drank around the house and that she had seen him in the state he was in at the time of the offense before, although not often. Rochelle testified that the arguing between the victim and the defendant was common. According to Rochelle, the victim was saying he was going to take the money, and the defendant replied, "What? You going to take my money?"
*1174 Dr. Hypolite T. Landry, Jr., coroner for East Baton Rouge Parish and an expert in forensic pathology, testified that the victim suffered a gunshot wound to the nose, causing damage and hemorrhage to the brain which resulted in death. Dr. Landry testified that there were areas around the wound that were burned by the powder from the weapon, which is known as stippling, and that there was soot on the bridge of the nose and the forehead. Dr. Landry testified that the soot indicated that the weapon was relatively close to the victim, but he also stated that a ballistics expert would be the best person to testify as to how close the weapon was when it was shot.
Jim Churchman, a forensic scientist at the Louisiana State Police Crime Lab who was accepted by the court as a forensics expert with particular expertise in the field of ballistics dealing with gunpowder residue and the calculation of the distance from a shooter to the target, testified that he had much experience dealing with the Colt .357 revolver, the weapon used in this offense. He testified he had a history of performing firing tests of the Colt .357 revolver to determine the distance from the shooter to the victim. Mr. Churchman testified that, from the amount of soot and stippling when a weapon is discharged, he could determine how far away the weapon was from the target. Mr. Churchman testified that, based on the photographs of the victim and the concentrated soot residue around the entrance wound, the gun was approximately four to eight inches away from the victim when fired. He also testified that the powder particles would diminish at distances of greater than a foot. Mr. Churchman stated that he did not actually test-fire the weapon involved in the offense.
On cross-examination, Mr. Churchman testified that the coroner would be in a better position to testify regarding the stippling because he examined the victim's body. Mr. Churchman testified that stippling alone could occur from as far away as two feet. Mr. Churchman again testified that he had not tested the weapon involved in this case. The defense counsel also asked Mr. Churchman if the victim's blood alcohol level of .20 was twice the legal limit of intoxication, to which Mr. Churchman responded affirmatively.
The defense presented its case, beginning with the stipulation that a witness from the crime lab would have testified that the victim's blood alcohol level was .20. Tully Vincent, a Baton Rouge police officer, testified that when he arrived at the scene of the offense, the defendant was in Sergeant Lomax's police vehicle. To the question, "Was there any doubt in your mind that Mr. Harris was intoxicated?", Officer Vincent replied, "None at all." According to Officer Vincent, when he turned the defendant over to another detective, he told the detective that the defendant was drunk. Officer Vincent testified that the defendant was excited and obviously upset about what had happened.

ASSIGNMENTS OF ERROR NUMBERS 8 AND 9

SUFFICIENCY OF EVIDENCE
In assignment of error number 8, the defendant contends the court erred in denying his motion for new trial, and in assignment of error number 9, the defendant contends the court erred in denying his motion for post-verdict judgment on a lesser responsive offense under LSA-C.Cr.P. art. 821. Both of these assignments of error relate to the alleged insufficiency of the evidence to support this conviction. The defendant does not deny that he shot the victim, nor does he argue that he shot him in self-defense. Instead, the defendant contends that the evidence showed that he was intoxicated at the time of the offense and could not have possibly formed the specific intent necessary for second degree murder or manslaughter, or, alternatively, that the evidence supported a conviction of manslaughter because the offense was committed in the heat of passion.
The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude the state proved the essential elements of the crime beyond a reasonable doubt. See LSA-C.Cr.P. art. 821; State v. Pooler, 96-1794 (La.App. 1 Cir. 5/9/97); 696 So.2d 22. As the trier of fact, *1175 the jury was free to accept or reject, in whole or in part, the testimony of any witness. Furthermore, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. On appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. State v. Pooler, 96-1794, p. 56; 696 So.2d at 58.
At the time of the offense, and presently, LSA-R.S. 14:30.1 provides, in pertinent part: "Second degree murder is the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm; ..." Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10. Specific intent need not be proven as a fact and may be inferred from the circumstances present and the actions of the defendant. Specific intent is a legal conclusion to be resolved ultimately by the trier of fact. State v. Carter, 96-0337 (La.App. 1 Cir. 11/8/96); 684 So.2d 432.
The defendant contends that his intoxication at the time of the offense prevented his formation of the specific intent to kill or to inflict great bodily harm. Evidence at trial established that the defendant drank every day until "buzz[ed]." The defendant's co-worker Mr. Johnson testified that he, the defendant, and the victim did not drink more on the day of the murder than usual, and he described the defendant as normal. While the victim's girlfriend, Ms. Smith, testified that the men did not usually drink two pints of whiskey every day, she also testified that the defendant's behavior was normal the day of the offense. The amount of drinking did not impair the defendant's ability to perform routine acts, such as driving, walking, or talking, according to Mr. Johnson and Ms. Smith. Ms. Smith and Mr. Johnson also testified that the defendant and the victim argued all of the time. While Demetric, the defendant's son, testified that he thought the defendant was intoxicated and that he saw the defendant stumbling when police led him away, he also testified that he never saw the defendant fall down. Rochelle, the defendant's daughter, testified that he had been drinking, his speech was slurred, and his walk was affected; she also testified that the defendant ordinarily drank around the house and that he and the victim commonly argued. While Sergeant Lomax and Officer Vincent, testified that the defendant was intoxicated, Sergeant Lomax also stated that the defendant seemed to understand his commands and was able to follow them without any problem, and that the defendant did not fall or stagger. Although the defendant had been drinking and may have been intoxicated, testimony established that he drank every day, he was able to drive himself and the victim to his house, he was able to respond to the police, and, after the shooting, he had a family member call the police. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have inferred beyond a reasonable doubt that the defendant was not so intoxicated that it precluded the presence of specific criminal intent.
We must now determine whether the state produced sufficient evidence of the defendant's guilt of the crime of second degree murder. At the trial, the state presented the testimony establishing that the defendant fired a shot prior to shooting the victim; thus, he knew the weapon was loaded before he fired the second shot which killed the victim. The state also introduced the testimony of Mr. Churchman that the victim's wound was inflicted with the gun four to eight inches away from his face; in Benjamin Eckels' taped statement, he said that the gun was a foot or a little over a foot away. Benjamin's taped statement also established that the victim was sitting in a chair at the kitchen table when the defendant "hauled off and shot him in his head." In his statement, Benjamin said that the defendant aimed the gun above the victim's nose and reached across the table to shoot. According to the taped statement of Demetric Harris, the defendant shot the victim when he attempted to get up from his chair, after other testimony established that the defendant had asked the *1176 victim to leave the house. Additional testimony established that the victim was unarmed and that the defendant brought the victim to his home to pay him for work he had performed. Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the state proved the essential elements of second degree murder beyond a reasonable doubt.
Having found the elements of second degree murder, the jury had to determine whether or not the circumstances indicated that the crime was actually manslaughter. LSA-R.S. 14:31(A)(1) provides:
A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.][2]
The existence of "sudden passion" and "heat of blood" are not elements of the offense but, rather, are factors in the nature of mitigating circumstances which may reduce the grade of homicide. Provocation is a question of fact to be determined by the trier of fact. Thus, the issue remaining is whether or not any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigating factors were not established by a preponderance of the evidence. State v. Crochet, 96-1666 (La.App. 1 Cir. 5/9/97); 693 So.2d 1300.
In this case, while the defendant and the victim were arguing and drinking prior to the shooting, testimony established that they argued and drank daily. Considering these facts, a rational trier of fact might well have concluded that the defendant acted with deliberation and reflection and not in the heat of passion at the time of the shooting. The jury obviously concluded either: (1) that the argument between the defendant and the victim over money was not sufficient to deprive an average person of his self-control and cool reflection; or (2) that an average person's blood would have cooled by the time the defendant shot the victim. See State v. Crochet, 96-1666, p. 11; 693 So.2d at 1307.
After a careful review of the record, we are convinced that a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have concluded the state proved beyond a reasonable doubt that the defendant was guilty of second degree murder, that the defendant was not so intoxicated so as to preclude the presence of specific intent, and that the mitigating factors were not established by a preponderance of the evidence. Accordingly, the trial court correctly denied the defendant's post-trial motions. These assignments of error are without merit.

ASSIGNMENT OF ERROR NUMBER 2

GRUESOME PHOTOGRAPHS
In assignment of error number 2, the defendant contends the court erred in admitting certain photographs (State Exhibits 13, 14, and 15) into evidence because he contends the photographs showed the same thing, the victim lying in a pool of blood, and were prejudicial and inflammatory. At trial, the defendant objected to these photographs on this basis and also commented that the defense was not going to argue that the victim was armed. The trial court found that the pictures were not gory, that they showed the victim on the floor from three different angles, and that some of the witnesses had injected into the case the issue of an aggressive move by the victim before the defendant *1177 shot him, such that the probative value outweighed any prejudicial effect.
Louisiana Code of Evidence article 401 provides: "`Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Louisiana Code of Evidence article 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."
Photographs which illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place, or thing depicted, are generally admissible, provided their probative value outweighs any prejudicial effect. Postmortem photographs of murder victims are admissible to prove corpus delicti, to provide positive identification of the victim, and to corroborate other evidence establishing the cause of death, the manner in which death occurred, and the location, severity, and number of wounds. State v. Hebert, 96-1884 (La.App. 1 Cir. 6/20/97); 697 So.2d 1040. A photograph may be admissible to corroborate other testimony in a case, such as specific intent to kill. State v. Pooler, 96-1794, pp. 42-43; 696 So.2d at 50. Gruesomeness of photographs does not, in and of itself, prevent admissibility. The trial court's admission of allegedly gruesome photographs will be overturned on appeal only if the prejudicial effect of the photographs clearly outweighs their probative value. No error will be found unless the photographic evidence is so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence. State v. Hebert, 96-1884, p. 16; 697 So.2d at 1049.
In this case, State Exhibits 13, 14, and 15 show the victim lying on the floor from different angles. They show the crime scene and that the victim was unarmed. Although these photographs show a large quantity of blood, they are not gruesome. When we balance the probative value of the photographs with the likelihood the jury was inflamed simply upon viewing these exhibits, we find the probative value of the evidence outweighs the possible prejudicial effect. The trial court did not err in its ruling. This assignment of error lacks merit.

ASSIGNMENTS OF ERROR NUMBERS 3 AND 4

EXPERT TESTIMONY
In assignments of error numbers 3 and 4, relying on LSA-C.Cr.P. arts. 719 and 729.3, the defendant contends that the trial court erred in allowing Mr. Churchman to testify concerning the characteristics of firing a gun at close range when the defense had no prior knowledge of the results of tests he had conducted, despite its discovery request for the production of such material. The defendant also contends the court erred in allowing Mr. Churchman to refer to the particular weapon and bullets involved in this case. In brief, the defendant mainly contends that prior to trial he should have had the opportunity to examine the basis from which Mr. Churchman reached his conclusion. The defendant argues that even though Mr. Churchman did not testify about the particular tests he conducted, his testimony was based on ballistics testing of a gun similar to that used in the present offense, and, in effect, the state got the evidence in through the "back door." The defendant in brief contends that Mr. Churchman's testimony was not impeachment evidence because the state's witnesses did not testify at trial regarding how far the gun was from the victim. The defendant contends that he had no opportunity to test the basis for Mr. Churchman's conclusion because the court did not admit the test results into evidence. During Mr. Churchman's entire testimony, according to the defense counsel's brief, the revolver which had been introduced into evidence was on the witness stand in front of Mr. Churchman with the ammunition.
The defense has the right, upon motion, to inspect and copy reports of scientific tests made in connection with the case that are in the possession of the district attorney and intended for use at trial. LSA-C.Cr.P. art. 719. The state has a continuing *1178 duty to disclose additional evidence which it discovers or decides to use at trial. LSA-C.Cr.P. art. 729.3. However, the state need not disclose information it does not possess. State v. Williams, 448 So.2d 659 (La.1984). When a party fails to comply with a discovery order, the court may grant a continuance, order a mistrial on the defendant's motion, or exclude the withheld evidence, among other sanctions. LSA-C.Cr.P. art. 729.5. Even assuming the state's discovery responses were deficient, declaration of a mistrial is not required in all cases of discovery violations. See State v. Selvage, 93-1435 (La.App. 1 Cir. 10/7/94); 644 So.2d 745, writ denied, 94-2744 (La.3/10/95); 650 So.2d 1174. The failure of the state to comply with the discovery procedure will not automatically command reversal. State v. Williams, 448 So.2d at 664. The defendant must show actual prejudice resulted from the discovery violation. State v. Selvage, 93-1435, p. 6; 644 So.2d at 750.
Prior to trial, the public defender's office filed a motion for discovery in which it asked, "Does the state have within its possession, custody, control, or knowledge any results or reports, physical or mental examinations, scientific tests or experiments made in connection with or material to this particular case which are intended for use at trial?" The next question asked the state to furnish a copy to the defendant.
On the third day of trial, the prosecutor informed the court that, after testimony on the second day of trial by the defendant's family members which was inconsistent with their taped statements, he asked Mr. Churchman to perform some ballistics tests on a weapon similar to that used in the offense. Mr. Churchman performed the tests on the morning of the third day of trial. The tests indicated that the weapon would have been fired three to four inches away from the victim. The prosecutor informed the court that he had no reports from Mr. Churchman, just the test fires. The prosecutor contended the tests constituted impeachment evidence. The defense contended that it had filed discovery motions seeking test results prior to trial, that it was completely surprised, and that it did not have a report by the expert, or an opportunity to review the results or to have its own expert look at the tests. The defense argued that the court should not admit the evidence, or, if the court admitted it, that it should grant a continuance for the defense to look at the information and obtain its own expert. The court ruled that the state could not introduce these tests into evidence in its case in chief because it did not comply with discovery, but the evidence would be admitted in rebuttal if warranted. The court observed that there had been no questions to the witnesses regarding the distance between the victim and the gun. When the defense counsel expressed concern over the state's calling Mr. Churchman as a witness, the court stated that Mr. Churchman could not testify about any tests he conducted pursuant to the prosecutor's request.
The defense later objected to any testimony by Mr. Churchman. The defense counsel argued that any testimony by Mr. Churchman regarding the weapon in this case would be inappropriate due to the late disclosure of the testing. The court stated that the prosecutor had a right to call Mr. Churchman as a witness, that he could testify about any relevant matter, and that the defense did not have to be informed in advance.
Mr. Churchman's testimony was based solely upon his experience as a firearms expert[3] and was not based on results obtained from the scientific tests he had conducted that morning. In response to the question of whether there would be soot of any quantity if a gun was fired over a foot away from its target, Mr. Churchman stated, "The training that I've received and if I was asked an off-hand question, given this weapon and this ammunition, and that's important. Given this .357 six inch revolver, .38 caliber P.M.C. and C.C.I. ammunition, I would." The defense counsel objected and Mr. Churchman did not complete his answer. The defense counsel also objected to the fact that the *1179 weapon was in front of the witness, such that Mr. Churchman's testimony referring to "that weapon" was improper. The court advised the prosecutor to rephrase the question to elicit a more general answer and the court also noted that Mr. Churchman had given his general testimony with the weapon in front of him. When the testimony resumed, the prosecutor asked Mr. Churchman a more general question.
The defense counsel later objected when the prosecutor asked Mr. Churchman to look at the photographs of the victim. The defense counsel argued that if Mr. Churchman were to testify about the photographs, it was beyond the purview of the court's ruling. The court overruled the defense counsel's objection, stating that Mr. Churchman's opinion as to the amount of soot or stippling based upon the photographs was not the result of testing he did, but was based on his expertise in ballistics. The defense counsel then appeared to indicate that if the question were limited to whether there was soot on the victim, he would have no problem. Thereafter, Mr. Churchman testified about the photographs from his general expertise. The prosecutor concluded his questioning by asking Mr. Churchman if he had test-fired the weapon involved in this case, to which Mr. Churchman replied that he had not. On cross-examination, the defense counsel asked whether the coroner would be in a better position to testify regarding the stippling because he examined the victim's body, to which Mr. Churchman replied affirmatively. The defense counsel also asked whether Mr. Churchman's testimony was based on his general expertise and whether he had tested the weapon involved in this case, to which Mr. Churchman replied that he had tested "[m]any, many weapons," but not the weapon in this case.
The trial court prohibited the state from introducing Mr. Churchman's test results into evidence and prohibited Mr. Churchman from referring to them. During his testimony, Mr. Churchman did not testify based upon the specific tests he conducted on the third day of trial, but instead based upon his general expertise. When Mr. Churchman referred to the particular weapon in this case in conjunction with firing distances, the defense objected and the state was ordered to rephrase the question to elicit a more general response. Furthermore, during direct and cross-examination, Mr. Churchman testified that he did not test the weapon involved in this offense. Therefore, these assignments of error are meritless.

ASSIGNMENTS OF ERROR NUMBERS 5, 6, AND 7

JURY INSTRUCTIONS
In assignment of error number 5, the defendant contends the trial court erred in denying his requests for special instructions concerning negligent homicide and criminal negligence because the evidence supported such instructions. In assignment of error number 6, the defendant contends the court erred in denying his request for a special jury instruction concerning intoxication because the court did not define intoxication for the jury. In assignment of error number 7, the defendant contends the court erred in failing to properly advise the jury on specific intent and its relationship to manslaughter.
A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given. LSA-C.Cr.P. art. 807. A trial court is required to charge the jury, in response to an otherwise proper request, as to the law applicable to any theory of defense which a jury could reasonably infer from the evidence. State v. Carter, 96-0337, p. 5; 684 So.2d at 435-436.
Regarding negligent homicide, the defendant requested that the court give the following instructions:
JURY INSTRUCTION # 8:
Negligent homicide is the killing of a human being by criminal negligence. LSA-R.S. 14:32.
JURY INSTRUCTION # 9:
Criminal negligence exists when, although neither specific or general criminal *1180 intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by [a] reasonably careful man under like circumstances. State v. Williams, 606 So.2d 1387 (La.App. 2nd Cir.1992); State v. Gray, 430 So.2d 1251 (La.App. 1st Cir.1983); State v. Marse, 365 So.2d 1319 (La.1978).
The trial court refused to give these special charges, finding that they were not supported by the evidence. The court also commented that State v. Williams, 606 So.2d 1387 (La.App. 2 Cir.1992), the case cited by the defendant, indicated that if the court gave an instruction on manslaughter under LSA-R.S. 14:31(A)(2), a negligent homicide instruction would not be required. The court noted that the Williams case cited State v. Tompkins, 403 So.2d 644 (La.1981).
In Williams, the Second Circuit found it was reversible error for the court not to instruct the jury as to negligent homicide in the defendant's second degree murder trial. State v. Williams, 606 So.2d at 1390. In reaching this conclusion, the Williams court distinguished State v. Marse, 365 So.2d 1319 (La.1978), which found the same error, but determined it was harmless. State v. Williams, 606 So.2d at 1390. The court in Marse held that although there was some evidence of negligent homicide in the record, the failure to give the requested charge did not constitute reversible error because the jury had sufficient information to understand that, if the defendant was only guilty of negligent homicide, it should return a verdict of not guilty to the charge of murder. State v. Marse, 365 So.2d at 1324.
In this case, we find that the negligent homicide charges were not supported by the evidence. The only evidence containing facts supporting negligent homicide was the testimony of the defendant's step-son and son, Benjamin and Demetric. Benjamin and Demetric testified that the victim tried to grab the gun immediately before being shot, and Demetric testified that the gun went off as the defendant was "falling back." Yet, the statements by both witnesses recorded immediately after the crime contradicted their testimony.
However, even assuming that there was sufficient evidence for the jury to find negligent homicide, such that the court should have given the defendant's instructions, the error, if any, is not reversible. The jury had enough information without the special jury charges to understand that, should it find the defendant guilty of criminal negligence, it should not find him guilty of second degree murder. See State v. Gray, 430 So.2d 1251 (La.App. 1 Cir.1983). The trial court gave instructions during the general charge to the jury regarding the element of specific intent required on the part of the defendant in order to find him guilty of second degree murder. Furthermore, the trial judge sufficiently instructed the jury on the elements of the possible verdicts and that they must find the state proved all the elements of one of those crimes beyond a reasonable doubt or return a verdict of not guilty. State v. Jackson, 450 So.2d 621 (La.1984). See also State v. Tompkins, 403 So.2d at 649.
Additionally, in this case, unlike in Williams, the trial court charged the jury as to LSA-R.S. 14:31(A)(2), that part of the manslaughter statute which deals with unintentional killings during the commission of certain felonies or misdemeanors. As the trial court commented, the Williams court noted that in that case "the trial court gave no instruction regarding manslaughter as an unintentional killing during the commission of certain felonies or misdemeanors under LSA-R.S. 14:31(2) ... If a trial court gives an instruction under 14:31(2), then a negligent homicide instruction may not be required. See State v. Tompkins, 403 So.2d 644 (La.1981)."[4]State v. Williams, 606 So.2d at 1390, n. 1. See also State v. Clark, 93-903 (La.App. 3 Cir. 3/16/94); 638 So.2d 225. The defense counsel in closing argument told the jury that if it found that the defendant lacked specific intent and shot the *1181 victim while falling back, the jury could reach a manslaughter verdict, referring to LSA-R.S. 14:31(A)(2). During voir dire, the prosecutor informed potential jurors that if a person did not intend to kill or inflict great bodily harm upon another person, but caused death while committing a battery, for example, then the person would have committed manslaughter. The defense also mentioned this provision of the manslaughter statute during voir dire. The court informed the jury regarding this provision of the manslaughter statute. For these reasons, while the trial court may have erred in not giving the negligent homicide charges, this error is not reversible. This assignment of error is without merit.
The instruction at issue on intoxication was as follows:
JURY INSTRUCTION # 6:
"The term intoxication means a condition resulting from the drinking of alcoholic beverage[s] which impairs a person's normal capacity to form a specific intent to kill or inflict great bodily harm." State v. Leroux, 641 So.2d 656, 661 (La.App. 5th Cir.1994).
The court found that this instruction was incomplete and also stated that the instruction was included in the instructions to be given. The court instructed the jury regarding intoxication as follows:
Voluntary intoxication is no defense to a crime unless the crime is one requiring specific intent. And then only under certain circumstances. If you believe that a drunken or intoxicated condition prevented the accused from being able to form the specific intent to commit a crime requiring specific intent, or if the evidence as a whole leaves you with a reasonable doubt as to whether the accused was able to have, and did, in fact, have a specific intent to commit the crime charged due to his drunkenness or intoxication, then you must give him the benefit of that doubt and find him not guilty of any crime requiring specific intent.
The trial court correctly charged the jury and did not err in refusing the defendant's requested charge on intoxication. The term intoxication is a generally understood term which is incapable of precise definition as its meaning can depend upon the particular circumstances involved. See State v. Hightower, 238 La. 876, 116 So.2d 699 (1959). This assignment of error has no merit.
Regarding assignment of error number 7, the defendant submitted the following instruction regarding specific intent and manslaughter:
JURY INSTRUCTION # 2
"To be found guilty of second degree murder, a defendant must have the specific intent to kill or inflict great bodily harm. Manslaughter consists, in pertinent part, of a homicide committed in the heat of passion. It, too, requires the presence of specific intent to kill or inflict great bodily harm." State v. Harris, 527 So.2d 1140, 1143 (La.App. 1st Cir.1988), citing, State v. Hilburn, 512 So.2d 497 (La.App. 1st Cir.), writ denied, 515 So.2d 444 (La.1987).
The court declined to give this instruction, stating that the jury would be charged with the applicable parts of LSA-R.S. 14:31(A), following the wording of the statute. The trial court's instruction, which tracked the statutory language, along with the instruction on specific intent completely instructed the jury regarding manslaughter and there was no error in failing to include the defendant's requested charge. These assignments of error are without merit.
For the foregoing reasons, the defendant's assignments of error lack merit. Therefore, the defendant's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] The defendant abandoned assignment of error number one in brief.
[2] The defendant does not argue that the evidence supported the verdict of manslaughter under LSA-R.S. 14:31(A)(2), which is "[a] homicide committed, without any intent to cause death or great bodily harm. (a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person; ..." As earlier discussed, the evidence was sufficient to support a finding of specific intent.
[3] Prior to being qualified as an expert, Mr. Churchman testified that he began working at the crime lab in 1974 and was trained in firearms analysis. He stated that he had attended schools and received training at the F.B.I. Academy and the A.T.F. Lab which dealt with gunpowder residue analysis.
[4] At the time of the offense in the Williams case, LSA-R.S. 14:31(A)(2) was designated as LSA-R.S. 14:31(2).