752 So.2d 280 (2000)
STATE of Louisiana
v.
Frederick PATTERSON.
No. 99-KA-994.
Court of Appeal of Louisiana, Fifth Circuit.
January 25, 2000.
*281 Margaret S. Sollars, Thibodaux, Louisiana, Attorney for Appellant Frederick Patterson.
Anthony G. Falterman, District Attorney, Donald D. Candell, Assistant District Attorney, Gonzales, Louisiana, Attorney for Appellee State of Louisiana.
Panel composed of Judges CHARLES GRISBAUM, Jr., JAMES L. CANNELLA and MARION F. EDWARDS.
CANNELLA, Judge.
Defendant, Frederick Patterson, appeals from his conviction for second degree murder and his sentence to life imprisonment at hard labor. For the reasons which follow, we affirm the conviction and sentence.
Testimony from trial provides the following information. A friend of defendant's, Lowell Bastian (Bastian), testified that, on the morning of November 9, 1997, he picked up defendant and drove him to LaPlace and Kenner to shop for a car. According to Bastian, the two drank 190 proof daiquiris during the morning. They stopped for lunch, then went to a pool hall, where they drank more alcoholic beverages. The men then shared a fifth of Crown Royal.
On their way back to defendant's home in Edgard, Bastian and defendant stopped at Bridgeview Grocery. There, they met two of their friends, Thomas Allen (Allen) and the victim, Michael Alexander (Alexander). The four men rode together to defendant's house in Bastian's car. Allen and the defendant lived on opposite sides of a divided house. Allen testified that defendant went into his own apartment, retrieved a gun, then went to Allen's apartment and held the gun to Allen's head. The defendant asked Allen what he'd said to defendant's girlfriend. Allen responded that he had never seen defendant's girlfriend. Defendant apologized *282 and the four men went to Grant's Bar (a/k/a Big Stuff Bar) on Perkins Street in Vacherie. By that time it was night.
Bastian testified that he parked his car on the side of the bar. Defendant and Allen exited the vehicle and Alexander and Bastian stayed inside. Allen went inside the bar, while defendant walked over to where Elizabeth Bright (Bright) and her friend, Dennis Dumas (Dumas), were sitting in her car. Bright testified that she had known defendant for a month or two and that she had known Alexander for much longer.
Defendant told Bright that he was looking for her "old man," meaning her boyfriend. She asked defendant why, since he did not know her boyfriend. Defendant told her, "Somebody told me that he wanted to beat my ass." Bright told him, "That's not true." At that point Alexander approached defendant. Defendant grabbed him by his shirt and demanded to know why he had lied to him. Alexander asked the defendant what he was talking about. Defendant picked up Alexander and threw him against the windshield of Bright's car. Then defendant shoved Alexander to the ground. Defendant kicked and punched Alexander repeatedly and jumped on him with both feet. Bastian testified that defendant held a gun in one hand and a knife in the other. At one point, defendant fired the gun and the bullet hit the ground next to Alexander's head.
Bright put her hand on defendant's stomach and told him to stop. Defendant hugged her and told her that he was sorry. Bright moved away and defendant began to beat Alexander again. Allen exited the bar in time to see defendant throw a few final punches. Bastian and the defendant then got into Bastian's car and the two men left the scene. Bastian asked defendant why he had attacked Alexander and the defendant responded, "Man, that man was trying to set me up, you know." Bastian suggested that they stop at the courthouse because the authorities would be looking for him. Defendant said that if the police wanted him, they were going to get him from his house. Bastian then dropped the defendant off at his house.
Bright stayed with Alexander until paramedics arrived. Harold Martinez (Martinez), an emergency medical technician with Acadian Ambulance Service, testified that he arrived at the scene at about 8:01 p.m. Alexander was awake, but confused, complaining of head and chest pain. Martinez observed that the victim had sustained a large soft tissue injury to the back of the head and he removed much gravel from the wound. There was no other visible trauma. Alexander's vital signs were stable. He was transported to East St. James Hospital.
Shortly after he arrived at the hospital, Alexander's condition began to deteriorate rapidly. His heart rate fell, he lost consciousness, then he died.
Allen testified that defendant knocked on his door in the early morning hours of November 10, 1997. Defendant asked Allen, "Man, what happened?" Allen answered, "Man, won't you tell me what happened." Allen told defendant that Alexander might not make it and defendant said, "He brought it on hisself [sic]; he deserved it." Defendant then left Allen's apartment.
Deputy Ethan Landry of the St. James Sheriffs Office testified that an arrest warrant was issued for defendant on the night of November 9, 1997. On the morning of November 10, defendant was apprehended by St. John the Baptist Parish authorities. Landry retrieved defendant from St. John the Baptist Parish and transported him to the courthouse in St. James Parish.
Dr. William Newman performed an autopsy on Alexander's body. He testified that he found three areas of laceration at the back of the victim's scalp and found rib fractures. He determined the cause of death to be excessive hemorrhaging from a laceration to the liver. Dr. Newman testified *283 that the victim's injury led to a documented loss of 2,000 cubic centimeters of blood, which was one-half of his total blood volume.
Dr. Carl Poche, the St. James Parish Coroner, issued Alexander's death certificate. He did not examine the victim, but based his findings on the results of the autopsy. He listed the cause of death as shock due to exsanguination, meaning a large loss of blood into the belly cavity. Dr. Poche testified that his report termed the victim's liver injury a "rupture," but that he considered it to be the same thing as what Dr. Newman termed a "laceration."
On December 18, 1997, the St. James Parish Grand Jury issued an indictment charging defendant with second degree murder, a violation of La. R.S. 14:30.1. Defendant was arraigned on December 29, 1997 and pled not guilty.
Defendant was tried by a twelve person jury on January 21 and 22, 1999. At the conclusion of trial, the jury returned a 10-2 verdict of guilty as charged. On April 19, 1999, the trial judge sentenced defendant to the mandatory term of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. Defendant appeals from this conviction and sentence, assigning two errors.

ASSIGNMENT OF ERROR NUMBER ONE
In his first assignment of error defendant argues that the State failed to prove his guilt beyond a reasonable doubt because the evidence was not sufficient to show that he had the specific intent to kill or inflict great bodily harm.
The standard to be used by the appellate court in evaluating the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of every element of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Mussall, 523 So.2d 1305 (La.1988); State v. Jordon, 98-823 (La. App. 5th Cir. 3/10/99), 732 So.2d 569.
Second degree murder is the killing of a human being when the offender has specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1A(1); State v. Barnes, 98-932, p. 3 (La.App. 5th Cir. 2/10/99), 729 So.2d 44, 46, writ denied, 99-1018 (La.9/17/99), 747 So.2d 1099. Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent may be inferred from the circumstances and actions of the defendant. State v. Lewis, 98-672, p. 5 (La.App. 5th Cir. 3/10/99), 732 So.2d 556, 559.
There are several factors which point to defendant's specific intent to kill, or at least to inflict great bodily harm. Alexander was five feet, nine inches tall and weighed a mere 140 pounds. Defendant, a larger man,[1] relentlessly punched, kicked and jumped on Alexander, even after the victim was rendered helpless. Dumas, who witnessed the beating, testified that Alexander did not attempt to fend off defendant, because he was unable. According to Dr. Newman, who performed the autopsy on Alexander's body, the beating was severe enough to cause broken ribs and a lacerated liver. Defendant also fired a bullet at close range, within inches of the victim's head. Even after Bright pushed him away from the victim and told him to stop, defendant walked back to hit and stomp on Alexander again. When asked why he attacked the victim, defendant responded, "Man, that man was trying to set me up, you know." Further, after inflicting multiple injuries to the victim, including visible head injuries, defendant left the scene. He did not offer any help to the victim. Later, when the defendant *284 was told that the victim might die, he replied that the victim deserved it.
Defendant submits that the evidence supported, at most, a conviction of manslaughter.[2] Defendant argues that he attacked Alexander in the heat of passion after finding out that Alexander had lied to him about threats which Bright's boyfriend had made against him. Defendant contends that Alexander had told him that Bright's boyfriend, Steve Easem (Easem), had wanted to beat him. For that reason, defendant approached her outside the bar and asked where was Easem. Bright testified that she told defendant that it was not true that her boyfriend wanted to beat him. When Alexander approached following this dialogue, defendant attacked him.
Upon review, we find, as did the jury, that these facts do not constitute provocation sufficient "to deprive an average person of his self-control and cool reflection," as contemplated by the manslaughter statute. La. R.S.14:31A(1).
Defendant next asserts that he was sufficiently intoxicated so as to negate specific intent. La. R.S. 14:15 provides, in pertinent part:
The fact of an intoxication or drugged condition of the offender at the time of the commission of the crime is immaterial, except as follows:
. . . .
(2) Where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime.
When a defendant raises intoxication as a defense, he must prove, by a preponderance of the evidence, that he was in fact intoxicated. When circumstances exist which indicate that intoxication could have precluded specific intent, the burden shifts to the State to show, beyond a reasonable doubt, that specific intent was present. State v. Dammeron, 98-378, pp. 2-3 (La.App. 5th Cir. 9/29/98), 719 So.2d 1151, 1154. Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Whether intoxication is sufficient to negate specific intent is a question for the trier of fact. Id.; State v. Leeming, 612 So.2d 308, 313 (La. App. 5th Cir.1992), writ denied, 616 So.2d 681 (La.1993).
Bastian, who was with the defendant during the entire day leading up to the beating, testified that the two of them began drinking at about 8:00 a.m. They first drank 190 proof daiquiris from a shop in LaPlace. Bastian testified that they each had a large cup, about ten inches tall. After having lunch, the two stopped at a pool hall, where they each had another daiquiri. They bought a fifth of Crown Royal before stopping at defendant's house, then finished it together. Bastian testified that he himself was drunk that day and he believed that the defendant was also drunk. Bright testified that when she encountered the defendant outside the bar, she could tell that he had been drinking. However, she did not actually see him drinking.
We find that defendant proved his intoxication by a preponderance of the evidence. The burden thus shifted to the State to *285 prove, beyond a reasonable doubt, that specific intent was present. Although defendant consumed a good deal of alcohol on the day leading up to the beating, there are indications that its effects had dissipated by the time of the attack so that the defendant could have formed the required specific intent.
Bastian testified that he and defendant did their drinking during the day and that they did not drink in the evening. Bastian also testified that defendant was not drunk to the extent that he was stumbling and that defendant spoke as if he knew what he was saying. Moreover, the record supports a finding of defendant's specific intent to inflict great bodily harm, evidenced by defendant's own statement made shortly after the incident, that he attacked the victim because the victim had tried to set him up.
Therefore, viewing the evidence in the light most favorable to the prosecution, we find that the State proved the essential elements of second degree murder beyond a reasonable doubt. This assignment of error has no merit.

ASSIGNMENT OF ERROR NUMBER TWO
By this assignment, defendant argues that the trial court erred in rejecting his proposed jury instructions pertaining to intoxication and negligent homicide.
La.C.Cr.P. art. 807 provides:
The state and the defendant shall have the right before argument to submit to the court special written charges for the jury. Such charges may be received by the court in its discretion after argument has begun. The party submitting the charges shall furnish a copy of the charges to the other party when the charges are submitted to the court.
A requested special jury charge shall only be given by the court if it does not require qualification, limitation, or explanation and if it is wholly correct and pertinent. State v. Alexander, 97-1199, p. 13 (La.App. 5th Cir. 9/29/98), 720 So.2d 82, 89, writ denied, 98-3109 (La.4/9/99), 740 So.2d 628; State v. Hidalgo, 95-319, p. 5 (La.App. 5th Cir. 1/17/96), 668 So.2d 1188, 1192. Failure to read a special jury charge constitutes reversible error only when there is prejudice to the substantial rights of the defendant or the violation of some constitutional or statutory right. State v. Bailey, 97-493, p. 7 (La.App. 5th Cir. 11/12/97), 703 So.2d 1325, 1330.
Defendant offered the following jury instructions on the issue of intoxication:
Defendant's Request for Jury Instruction No. 1
Voluntary intoxication is no defense to a crime unless the crime is one requiring specific intent. And then only under certain circumstances. If you belief [sic] that a drunken or intoxicated condition prevented the accused from being able to form the specific intent to commit a crime requiring specific intent, or if the evidence as a whole leaves you with a reasonable doubt as to whether the accused was able to have, and did, in fact, have a specific intent to commit the crime charged due to his drunkenness or intoxication, then you must give him the benefit of that doubt and find him not guilty of any crime requiring specific intent.

State v. Harris, 708 So.2d 1169 (La. App. 1st Cir.1998); State v. Leroux, 641 So.2d 656 (La.App. 5th Cir.1994); La. R.S. 14:15.
Defendant's Request for Jury Instruction No. 2
The term "intoxication" means a condition resulting from the drinking of alcoholic beverage which impairs a person's normal capacity to form a specific intent to kill or inflict great bodily harm.

State v. Leroux, 641 So.2d 656 (La. App. 5th Cir.1994).
The trial transcript shows that the trial judge reviewed defense counsel's proposed *286 intoxication instructions and rejected them because they were substantially the same as the trial court's proposed charge. The trial judge ultimately gave the following instruction as to the intoxication defense:
Regarding defenses. The fact that the defendant was in an intoxicated condition at the time of the commission of the crime is usually not a defense. However, where the circumstances indicate that the defendant voluntarily became intoxicated and that his intoxicated condition precluded or prevented the presence of a specific intent or special knowledge required in a particular crime this fact constitutes a defense to a prosecution for that crime.
The defendant's plea of intoxication or drunkenness is a special defense and like any other defense must be proved by him to your satisfaction. Once the defense of voluntary intoxication is raised, the State has the burden of proving beyond a reasonable doubt that the defendant had a specific intent to kill or inflict great bodily harm. Thus, if you find that the defendant was in such an intoxicated condition that he did not have the specific intent to kill or inflict great bodily harm required to commit Second Degree Murder or the lesser offense of Manslaughter, you must find the defendant not guilty.
We find that the trial court's charge was a proper and complete statement of the law regarding the intoxication defense. Defendant did not suffer any prejudice due to the trial court's rejection of his proposed jury charge. Moreover, the term intoxication is a generally understood term which is incapable of precise definition, as its meaning can depend upon the particular circumstances involved. State v. Harris, 97-0537, p. 21 (La.App. 1st Cir. 2/20/98), 708 So.2d 1169, 1181, writ denied, 98-0758 (La.9/4/98), 723 So.2d 434. Defendant's argument as to this charge has no merit.
Next, defendant moved the trial court to instruct the jury on negligent homicide[3]. Defendant offered the following jury charges:
Defendant's Request for Jury Instruction No. 4
Negligent homicide is the killing of a human being by criminal negligence. If the defendant was only guilty of negligent homicide, you should return a verdict of not guilty to the charge of murder.

State v. Marse, 365 So.2d 1319 (La. 1978); La. R.S. 14:32.
Defendant's Request for Jury Instruction No. 5
Criminal negligence exists when, although neither specific or general intent is present, there is such disregard of the interest of others that the offender's conduct amounts to gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.

State v. Harris, 527 So.2d 1140, 1143 (La.App. 1st Cir.1988); State v. Williams, 606 So.2d 1387 (La.App. 2nd Cir.1992); State v. Gray, 430 So.2d 1251 (La.App. 1st Cir.1983), State v. Marse, 365 So.2d 1319 (La.1978).
The trial court denied proposed instructions 4 and 5 because negligent homicide is not a responsive verdict to second degree murder. Defense counsel conceded that negligent homicide was not a responsive verdict to second degree murder, but continued to urge the trial court to accept the proposed charges, arguing that they were pertinent to the facts of the case. The trial court again denied defendant's request, stating that the requested charges would confuse the jury. Defendant now *287 complains that the trial court ruled in error.
La.C.Cr.P. art. 803 provides, in part, that "[w]hen a count in an indictment sets out an offense which includes other offenses of which the accused could be found guilty under the provisions of Article 814 or 815, the court shall charge the jury as to the law applicable to each offense." The responsive verdicts to second degree murder are listed in La.C.Cr.P. art. 814A(3) as (1) guilty, (2) guilty of manslaughter, and (3) not guilty. Negligent homicide is clearly not included in that list. However, La.C.Cr.P. art. 802 obligates the trial court to charge the jury, when properly requested, as to the law applicable to any theory of defense which the jurors could reasonably infer from the evidence. State v. Jackson, 450 So.2d 621, 632 (La. 1984); State v. Dorsey, 30-683, p. 6 (La. App. 2nd Cir. 6/24/98), 718 So.2d 466, 470, writ denied, 98-2227 (La.12/18/98), 732 So.2d 54.
Defendant argues that a similar case, State v. Williams, 606 So.2d 1387, 1390 (La.App. 2nd Cir.1992), should be followed here. In that case, the Second Circuit found that it was reversible error for the trial court not to instruct the jury as to negligent homicide in the defendant's second degree murder trial, since there was evidence from which the jury might have inferred that the defendant was guilty of negligent homicide.
The Williams case involved a situation where the defendant shot the victim and there was conflicting testimony as to whether the victim grabbed for the gun, there was a struggle and the weapon discharged, or the defendant directly shot the victim upon approach. Thus, in Williams, there was evidence presented from which the jury could have found defendant guilty of negligent homicide.
While we agree with the holding in Williams given the facts presented therein, the instant case is distinguishable from Williams. In this case, there was no evidence introduced at this trial from which the jury might have inferred that defendant was guilty of negligent homicide. There was no evidence indicating that defendant hit the victim by accident or merely by disregard of the interests of others. To the contrary, defendant's actions in beating Alexander were deliberate and repeated, lasting several minutes and resuming even after Bastion had stopped the defendant. Under no inference of the jury could the actions by defendant in this case constitute negligence as contemplated by La. R.S. 14:32. See, State v. Hardy, 97-1248, p. 1180 (La.App. 3rd Cir. 3/6/98), 711 So.2d 715, 721, writ denied, 98-0927 (La.9/4/98), 723 So.2d 954; State v. Harris, 97-0537 at p. 19, 708 So.2d at 1180.
Therefore, we find no error in the trial court rulings refusing to give the defendant's proposed charges on intoxication and negligent homicide. This assignment of error lacks merit.

ERRORS PATENT REVIEW
The record was reviewed for errors patent and none were found.
Accordingly, for the reasons set forth above, the conviction of defendant to second degree murder and his sentence to life in prison at hard labor without benefit of parole probation or suspension of sentence are affirmed.
AFFIRMED.
NOTES
[1] Bastian testified that the victim was small in comparison to the defendant.
[2] Manslaughter is defined in La. R.S. 14:31 in pertinent part as follows:

A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed;[.]
[3] La. R.S. 14:32A defines negligent homicide as "the killing of a human being by criminal negligence."