MARION F. EDWARDS, Judge.
| ^Defendant, Chris Gilkers, appeals from his conviction for second degree murder, a violation of LSA-R.S. 14:30.1. For the following reasons, we affirm.
On June 1, 2000 Chris Gilkers was. indicted for the April 8, 2000 second degree murder of his wife, Rita Gilkers. On June 5, 2000, Gilkers entered a not guilty plea to the charges. The trial was held May 9-15, 2001, before a 12-person jury.
On the morning of May 11, 2001, after reviewing proposed jury instructions, the State notified the court of its objection to the inclusion of negligent homicide as a responsive verdict in this case. The judge took the matter under advisement. . Later on that date, the trial judge ruled that the defense’s request for a responsive verdict on negligent homicide was being allowed, over the State’s objection. The State sought supervisory writs to this Court. On May 14, 2001, this Court denied the application for writs after [^finding no abuse of discretion by the trial court ruling.[1] The State then sought writs to the Louisiana Supreme Court. On May 15, 2001, the Louisiana Supreme Court granted the application for writs and ordered the trial court to strike the jury charge concerning negligent homicide and to remove negligent homicide as a responsivé verdict to the charge of séeond degree murder.[2] Thereafter, Gilkers filed a “Request for Clarification,” with the Louisiana Supreme Court, in respect to its order of May 15, 2001. In response, the Louisiana Supreme Court issued an identical order to the one rendered May 15, 2001.[3]
*1154 On May 15, 2001, Gilkers sought to have a special jury - charge on negligent homicide included in the instructions to the jury. The trial court judge denied the request, and Gilkers filed a Notice of Intent to Seek Writs and a Request for Stay Order with the district court. The Request for Stay Order was denied, but time was allowed for Gilkers to seek writs to this Court.
On May 16, 2001, this Court denied the request for a stay and denied the application for writs.[4]
The trial proceeded without Gilkers’ requested special charge and without the responsive verdict on negligent homicide and he was found guilty as charged on May 16, 2001 by a unanimous 12-person jury.
On July 16, 2001, Gilkers filed a Motion for New Trial on the basis of newly discovered evidence. The matter was heard that date and the trial judge denied the motion.
Also, on July 16, 2001, after notifying the court that he was ready for sentencing, Gilkers was sentenced to serve life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. Gilkers made an oral motion for appeal, which was granted by the court.
¿FACTS
On April 8, 2000, at approximately 9 p.m., Christy Gilkers and her half-sister, Jessica Schmidt, were home with their mother, Rita Gilkers, at 514 Manson Street in Metairie. Their father, Chris Gilkers was not home at the time, though he had been there earlier and then left. After watching T.V., Jessica Schmidt fell asleep and later woke up and heard her mother and stepfather arguing and her stepfather cursing. Jessica Schmidt got up and went towards her mother’s room. Her mother was in her bed and her stepfather had a gun in his hand. Jessica’s stepfather, Chris Gilkers, told her to go to her room and she complied. A gunshot could be heard in Rita Gilkers’ bedroom and this awakened Christy Gilkers. Christy Gilkers walked into her mother’s bedroom and saw her mother in bed and her father shaking her mother. Following this incident, Chris Gilkers came into the girls’ room and he was still holding the gun. He laid down with Jessica Schmidt and asked if she loved him. Jessica asked her stepfather why was he doing this. Chris Gilkers then went back in his wife’s bedroom before going downstairs and out the house. After Chris Gilkers went outside into the backyard, Christy Gilkers locked the doors and her half-sister, Jessica, called the police.
At approximately 1 a.m., on April 8, 2000, a 911 emergency call was received for the address at 514 Manson Street in Metairie.
Jefferson Parish Sheriff Officer Jerilyn Morse was one of the officers dispatched to the location and, when she arrived, she noticed the door open at the subject address and saw red hand marks on the. wall leading upstairs. Two young girls, later identified as Christy Gilkers and Jessica Schmidt, were outside across |Kthe street from the house and behind a parked car. The girls were upset, crying and scared. They were turned over to neighbors, Cheryl and Evans Jeansonne, during the investigation.
Deputy Randall Fernandez, of the Jefferson Parish Sheriffs Office, Fourth District, had also been dispatched to the scene. He received information from the other deputies on the scene that the children had told them that their father shot their mother. The officers surrounded the *1155 perimeter of the residence, because they were initially unsure if Chris Gilkers was still inside.
Upon entering the second floor of the apartment, the officers discovered a white female, with head trauma and no vital signs. The top dresser drawer was opened about six inches and contained a .9mm Ruger handgun. The gun’s slide was partially locked back and there appeared to be a shell in the chamber. The bedroom dresser had been pierced by a bullet, which exited the back of the dresser and entered the wall of the bedroom. The scene was photographed and evidence was gathered by the Crime Lab.
As Officer Fernandez exited the house, he saw a white male run from between two houses and into the street. The officer gave chase westbound on Manson Street. The subject jumped a gate and hid behind a barbecue pit. Once cornered, it took five officers to handcuff the subject because he was screaming, struggling and fighting. When apprehended, the subject, later identified as Chris Gilkers, had blood on his shorts and socks. There was also dried blood on Gilkers’ side, front, back and hands. Additionally, there were scratches on his back. Following his arrest, Gilkers was searched, and, in his pockets, police found a large amount of cash, a .9mm round of ammunition, and a wallet with his identification. Gilkers was placed in a police car and taken to police headquarters.
IfiAt police headquarters, Gilkers met with Homicide Detective David Morales. Detective Morales advised Gilkers of his Miranda rights. Detective Morales did not smell alcohol on Gilkers and his speech was not slurred, nor did Gilkers stagger, although Detective Morales recognized that the defendant was intoxicated. Gilk-ers gave a videotaped statement to Detective Morales wherein he stated that he and his wife had argued about money and he left the house about 8:30 p.m. He drank a 12-pack of beer and drove around. He acknowledged that he had a .9mm Ruger handgun that he kept at home in the top dresser drawer. He stated that he could not remember that the gun discharged. He stated that all he remembered was arguing with his wife then she was lying in a pool of blood.
An autopsy of the victim, Rita Gilkers, was conducted on April 8, 2000. The autopsy revealed no signs of a struggle and the cause of death was determined to be from a single gunshot wound to the head.
Gilkers presented three witnesses who testified concerning the amount of alcohol he had consumed on the night of the killing. Among the three, Carl Knight, Gilk-ers’ nephew, testified that he was present with Gilkérs on the night of the murder, at approximately 11:00 or 11:30 p.m., at Wayne’s World, a bar located at Hyman Street and Jefferson Highway. According to Knight, Gilkers drank two pitchers of beer and two shots of liquor. Knight stated that he did not feel it was safe for Gilkers to drive that night and that he tried to get Gilkers to wait a half-hour before leaving the. bar. ■ Gilkers refused, jumped in his truck and left. According to Knight, when Gilkers walked to his truck he had a gun sticking out of his back pocket.
The defendant, Chris Gilkers, took the stand in his own defense. He testified that, on the night of the murder, he arrived home about 7:00 or 7:30 p.m. and unloaded his truck. He ate, drank two beers and went to the Auto 17Zone, before returning home again at about 8:30 p.m. He testified that he then left home and went to the store to get a 12-pack of beer and that he drank between 9 and 12 beers. Thereafter, Gilkers left for Wayne’s World where he met his sister and nephew. Ac *1156 cording to Gilkers,'he drank two pitchers of beer and between six and seven shots of liquor before leaving the bar. Gilkers also testified that his sister tried to stop him from leaving, and that he arrived home but did not remember driving. Gilkers admitted killing his wife, but stated that he did not intend to do this. He said the gun was loaded and in his hand. He claimed that he stumbled and that the gun fired, striking his wife. He testified that he remembers the “bang” and that he went to his wife, held her and moved her on the bed. Gilkers testified that he was very drunk. He said he got blood on him from moving his wife and he got blood on the walls from running through the house. He denied ever intentionally pointing a gun at his wife. According to Gilkers, his daughter, Jessica, told him to leave. He said he left the house in a panic and passed out on the ground. When he awoke, he saw the blood on him and went home, where he was apprehended by police.
Under cross-examination, Gilkers denied that he and his wife had separated prior to the move to Manson Street. He also denied that two nights before her murder, his wife-had told him to get out. Additionally, he denied threatening ■ his wife prior to her murder. The State presented as rebuttal witnesses James Schmidt (the victim’s brother) and Christy Gilkers.
Christy Gilkers testified that the night before her-mother’s death, the victim was reading to her from the book “Little House on the Prairie.” According to Christy, Gilkers entered the room and told her mother that he was going to “blow her brains out some -day.” Christy then testified that her father took the book and threw it across the room. Christy also testified that the week before her death I sthat her mom was cooking. The victim and Gilkers were arguing and Gilkers had a gun. Gilkers held the gun to her mother’s head. According to this child, Gilkers was not living with them a couple of nights before her mother’s murder, and his clothing was not at their Manson Street apartment.

ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment, Gilkers contends that the trial court erred in refusing to grant his motion for a new trial on the basis of newly discovered evidence. Gilk-ers argues that testimony by his daughter that he held a gun to his wife’s head a short time before her death and the testimony that he threatened to. “blow her brains out” were untrue and could be refuted by his witness, Carl Knight, because Knight was present at the victim’s home every evening when the victim and her daughters were home. Gilkers claims that Knight would further testify that he had never put a gun to his wife’s head nor threatened her on the occasions alleged by Christy Gilkers. He further contends that the evidence is material to the issue of his guilt. . Gilkers also alleges that, despite reasonable diligence, he was unable to present the evidence at trial because the daughter was presented as the last State witness during rebuttal. Gilkers concludes that the evidence would probably change the verdict. Gilkers made the same argument at the hearing on the motion for a new trial.
At the hearing on the motion for new trial, the State argued that Christy Gilk-ers’ testimony constituted impeachment evidence because he denied ever threatening his wife. The State also argued that the evidence was not newly discovered because Carl Knight testified at trial and could have testified that, at that time, he never saw Gilkers threaten his wife. Finally, the State emphasized the fact that it *1157 had presented ample evidence of the defendant’s guilt.
|flThe trial court judge denied the Motion for New Trial and gave the following reasons:
THE COURT:
First of all, I find this was not newly discovered evidence of something that would have not been put on trial relative to the testimony. At the time of trial and I sat throughout this entire matter. I heard the trial in its entirety and so did the jury, Mr. Regan, and I think there was — their decision was based upon the totality of the evidence, and essentially not upon the omission of one witness’ potential testimony. Therefore I am denying the motion for new trial.
DEFENSE:
We respectfully note an objection, and the Court with respect to its motion hearing denying - us the opportunity to put on the testimony.
A motion for new trial is based on the supposition that an injustice has been done to the defendant and unless such injustice is shown, the new trial motion shall be denied, no matter the allegations upon which it is based.[5] In the case of State v. Bright,[6] the Louisiana Supreme Court discussed the factors a defendant must show in seeking a motion for new trial based on newly-discovered evidence:
A defendant seeking a new trial based on newly-discovered evidence must show that the evidence was discovered since trial; that the failure to discover was not due to a lack of reasonable diligence; that the evidence is material; that the evidence is available; and, the evidence is such that, had it been introduced at the trial, it would probably have changed the verdict or judgment of guilty. When ruling on a new trial motion, a trial court’s duty is the narrow one of ascertaining on an objective basis whether there is new material fit for a new jury’s consideration. (Citations omitted).
The ruling on the motion for new trial is left to the sound discretion of the trial court judge and will' not be disturbed absent a clear abuse of discretion.[7]
ImDuring Gilkers’ cross-examination, he was specifically asked about these two incidents:
PROSECUTOR:
Do you remember about a week, a week and a half prior to this incident, you were in the kitchen and Rita was in the kitchen, and so was Christy; Rita was cooking dinner? Do you remember that?
DEFENDANT:
I don’t remember what you are talking about, ma'am.
PROSECUTOR:
You don’t remember getting Rita in the corner and putting the gun up to her head?
DEFENDANT:
No ma’ am.
[[Image here]]
PROSECUTOR:
And you don’t remember her reading “Little House on the Prairie” to Christy?
DEFENDANT:
*1158 Most of the time when I got home, they would be sleeping.
PROSECUTOR:
Do you remember throwing the book at the TV?
DEFENDANT:
I never threw no book at no TV ma‘am.
PROSECUTOR:
And you never looked at your wife and said “Some day I’m going to blow your brains out.” Did you?
DEFENDANT:
InNo, ma'am.
This testimony was rebutted by Gilkers’ daughter, Christy. During her testimony, in rebuttal, the following questions were asked:
PROSECUTOR:
Christy, do you remember the night before the night your mother got shot?
WITNESS:
Yes.
PROSECUTOR:
Were you with your mom that night?
WITNESS:
Yes.
PROSECUTOR:
What were you all doing?
WITNESS:
She was reading a book to me.
PROSECUTOR:
What book was she reading?
WITNESS:
“Little House on the Prairie.”
PROSECUTOR:
Did your dad come into the living room at any time that night while she was reading you the book?
WITNESS:
Yes.
PROSECUTOR:
And what happened?
WITNESS:
I^He just — he was yelling and then he told her that he was going to blow her brains out some day.
[[Image here]]
PROSECUTOR:
Did he do anything with the book?
WITNESS:
He threw it across the room.
PROSECUTOR:
Now, Christy, do you remember about a week or a week and a half before this happened?
WITNESS:
Yes.
PROSECUTOR:
■ You were living at the house with your mom and your sister and dad?
WITNESS:
Yes.
PROSECUTOR:
Was there a time where your mom was cooking in the kitchen and she and your dad got into an argument?
WITNESS:
Yes.
PROSECUTOR:
Did your dad have a gun that day?
WITNESS:
Yes.
[[Image here]]
PROSECUTOR:
What did he do with the gun?
hsWITNESS:
He held it up to her head.
Based on the foregoing, we find that the evidence that Gilkers characterized as “newly discovered” was merely cumulative of what the defendant had already testified to during cross-examination and presented nothing new for the jury’s *1159 consideration. Moreover, the witness from whom Gilkers sought to solicit this testimony, Carl Knight, was the defendant’s nephew and he had testified during Gilkers’ case in chief. Clearly, with the exercise of due diligence, Gilkers could have asked this witness during his initial testimony whether he ever heard or saw defendant threaten his wife. Finally, Gilk-ers has failed to demonstrate how this evidence, if presented, would have changed the verdict in this case. Based on the foregoing, we find that the trial court judge did not abuse his discretion in concluding that Chris Knight’s testimony did not constitute newly discovered evidence, and thus properly denied Gilkers’ motion for a new trial. This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER TWO

In his second assignment of error, Gilk-ers contends that, because the trial court refused to allow a special jury charge to be presented to the jury concerning negligent homicide, the jury had insufficient information to understand that if the victim’s death resulted from negligent homicide, then he was not guilty of second degree murder. He further contends that this issue has not been previously decided by this Court or the Louisiana Supreme Court because the issue presented on writs was whether negligent homicide could be given as a responsive verdict to a charge of second degree murder:
The record reveals the following facts surrounding Gilkers’ request for a special jury charge on negligent homicide:
|uAt the start of the trial, the State and the defense each filed requests for special jury charges. The sole special charge requested by the defendant was a special charge on negligent homicide. The proposed charge was as follows:

Negligent Homicide

Another responsive verdict to the charge of Second Degree murder is negligent homicide.
‘ Negligent homicide is the killing of a human being by criminal negligence.
Criminal negligence exists when, although neither specific nor general intent is present, there is such a disregard of the interest of others that the offenders [sic] conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under similar circumstances.
In order to have criminal negligence, it is not sufficient that a person merely fail to act reasonably. The conduct must be so far below that expected of a reasonable careful person that it can be considered to be a gross deviation.
Thus, in order to convict the defendant of negligent homicide, you must find:
1) that the defendant killed Rita Schmidt Gilkers; and
2) that the killing was a result of the defendant’s [negligence.]
(Emphasis added).
During a trial recess on May 9, 2001, defense counsel argued that the evidence would support a responsive verdict on negligent homicide, because the gun went off accidentally, in a negligent fashion. The State requested that the trial judge defer ruling until the evidence was presented, and the trial judge complied. The judge instructed the parties not to question prospective jurors on the subject of negligent homicide, but they could make reference to it in opening and closing arguments. The judge also allowed Gilkers to refer to “negligent act” as the opposite of “intentional act,” but not to state that negligent homi *1160 cide is a lesser included offense for second degree murder.
|is0n May 11, 2001, following the presentation of a number of defense witnesses, including Gilkers, who testified concerning his intoxication on the night of the murder, the trial court judge granted the defense’s request that the charge of negligent homicide be included in the responsive verdicts to the crime of second degree murder. The State notified the court of its intent to file for supervisory writs on this issue.
On May 14, 2001, this Court denied the State’s application, in State v. Gilkers.[8] This action was followed by an application for supervisory writs to the Louisiana Supreme Court filed by the State on May 15, 2001.[9] The Louisiana Supreme Court stayed the trial and notified the district court judge. On May 15, 2001, the Louisiana Supreme Court granted the writ, with the following statement:
Granted. Negligent homicide, La. R.S.14:32, is not a responsive verdict to a charge of second degree murder. La. Code Cm. P. art. 814(A)(3). The trial court is ordered to strike the jury charge regarding negligent homicide and remove negligent homicide from the responsive verdicts presented to the jury.
On May 15, 2001, following the initial decision by the Louisiana Supreme Court, and prior to the instruction to the jury, the State took the position that neither a responsive verdict nor a charge regarding negligent homicide could be presented to the jury. Gilkers, however, argued that if the facts supported it, a special charge could be given on negligent homicide. The court concluded with the following:
THE COURT:
Mr. Regan, I understand your argument and I can appreciate your argument, but I’m bound to follow the order of the Supreme Court, and as I interpret these orders they are saying to strike the jury charge as well as the responsive verdict.
11fiThereafter, the defendant notified the trial judge of his intent to seek writs with this Court.[10] In response to that application, this Court, on May 16, 2001, denied both the request for a stay and the writ petition.
Prior to closing arguments, the trial judge advised counsel that he would not restrict their closing arguments, and if they felt that they wanted to bring up certain topics which were not part of the jury instructions or responsive verdict, he would leave that to them. Gilkers specifically asked if he could tell the jury that defendant was drunk and “negligent with his gun and the lady was killed at this point.” The judge responded: “I will allow you to make reference to negligence.” Thereafter, closing arguments were presented.
Following arguments, the trial judge gave the general jury charge, which included the charge that defendant was charged with second degree murder and the responsive verdicts were second degree murder,, manslaughter or not guilty. In discussing the charge of second degree murder, the court indicated that it was a crime of specific intent. The court also advised the jury that manslaughter could occur in the absence of specific intent if the killing was in sudden passion or heat of blood. In addition to the general charge, the jury charge in this case included the State’s requested special jury charge on *1161 the issue of intoxication as it could affect specific intent and a special charge on the issue of flight.
After its deliberations, the jury returned a verdict of guilty of second degree murder.
We initially discuss defendant’s contention that the issue of whether he was entitled to a special jury charge on negligent homicide is properly before this Court, having not been previously been decided by this Court on writs.
|17Although that issue was presented to this Court in defendant’s application for writs filed May 16, 2001, this Court denied the defendant’s application.[11]
In a per curiam decision by the Louisiana Supreme Court, in State v. Fontenot,[12], the court stated:
A denial of supervisory review is merely a decision not to exercise the extraordinary powers of supervisory jurisdiction, and it does not bar consideration on the merits of the issue denied supervisory review, when appeal is taken from final judgment.
Under these circumstances, this Court may review this assignment of error presented on appeal.
Special jury charges are controlled by LSA-C.Cr.P. art. 807, which provides, in pertinent part, as follows:
LSA-C.Cr.P. art. 807. Special written charges.
The state and the defendant shall have the right before argument to submit to the court special written charges for the jury....
A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to bé given.
|1sOn appeal, Gilkers contends that he also requested a special jüry charge on the issue of negligent homicide only (i.e., not as a responsive verdict) and this request was denied by the district court. He argues on appeal, that this was error, relying on State v. Marse,[13] State v. Patterson,[14] and State v. Williams.[15]
In Marse, swpra, the Louisiana Supreme Court found that the trial court judge erred in a first degree murder case in not giving two special charges requested by defendant. The first charge consisted of a definition of negligent homicide and the second charge specifically stated that negligent homicide was not a responsive verdict to the indictment and therefore the jury has á duty to acquit if it found that defendant’s conduct amounted to no more than negligent homicide. In reaching its conclusion, the .Court reasoned as follows:
[W]e conclude that the requested special charges were wholly correct and pertinent. There was copious evidence, consisting of the testimony by Marse, the police officers and bystanders, from which the jury could have inferred that Marse was guilty of negligent homicide but not manslaughter or murder. The 'requested charges did not require qualification, *1162 limitation or explanation and were not included in other charges to be given.[16]
In State v. Patterson, supra, this Court found that the trial court did not err, when, in a trial for second degree murder, the trial court judge denied the defendant’s request for a special jury charge on negligent homicide. In Patterson, this Court reasoned that such a charge was not supported by the evidence and therefore was properly denied.
In State v. Williams, supra, the Second Circuit Court of Appeal was presented with a similar issue. In Williams, defendant was charged with second |iadegree murder. During the trial of the matter some witnesses testified that, shortly before the murder weapon was fired, a “tussle” ensued between defendant and the victim. In reversing the trial court conviction, the court found that the evidence presented at trial supported the requested jury charge on the law of negligent homicide.
A review of the defendant’s testimony in this case indicates that he admitted killing his wife; however, he alleges that it was an accident in that he had the gun in his hand, he stumbled, and the gun fired striking his wife.
Our review of the record indicates that the only written request for special jury charge filed by defendant in the record is the charge that speaks of negligent homicide as a responsive verdict to second degree murder. The defendant’s second requested special jury charge, reads 'as follows:

Negligent Homicide

Negligent homicide is the killing of a human being by criminal negligence.
Criminal negligence exists when, although neither specific nor general intent is present, there is such a disregard of the interest of others that the offenders [sic] conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under similar circumstances.
In order to have criminal negligence, it is not sufficient that a person merely fail to act reasonably. The conduct must be so far below that expected of a reasonable careful person that it can be considered to be a gross deviation.
Thus, in order to convict the defendant of negligent homicide, you must find:
1) that the defendant killed Rita Schmidt Gilkers; and
2) that the killing was a result of the defendant’s [negligence.]
(Emphasis added).
After a review of this requested charge, we find that Gilkers has misstated the law. The charge, in its present form, would imply that the defendant in this | ^second degree murder case could be convicted of negligent homicide. As previously discussed, and specifically mentioned by the Louisiana Supreme Court in its review of this issue, negligent homicide is not a responsive verdict to second degreq murder.[17] Under these circumstances, since the requested special charge is not “wholly correct” we find that it was properly excluded by the trial court.[18]
*1163 Furthermore, under LSA-C.Cr.P. art. 807, a special jury charge need not be given if “it is included in the ■ general charge.” Although inarticulate in its presentation, the defendant sought a charge that would alert the jury that if they concluded that the murder resulted from negligence, they should acquit the defendant. In the present case, the general charge contained language sufficiently broad to encompass the special charge that defendant sought. The general jury charge in this case contained the following instruction:
If the state has failed to prove beyond a reasonable doubt that the defendant is guilty of either the offense charged (i.e., second degree murder) or a lesser responsive offense (i.e., manslaughter), you must find the defendant not guilty.
Under these circumstances, we further find the trial court’s refusal to include defendant’s requested special charge in the instructions to be harmless because it was contained in the general charge. This assignment is without merit.

ERRORS PATENT (ASSIGNMENT OF ERROR NUMBER THREE)

Appellant requests, pursuant to La. C.Cr.P. art. 920, a review of the record for errors patent, any error discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence.
We note that at the time of sentencing, the trial court judge failed to advise Gilkers of the two-year prescriptive period for filing for post-conviction relief. LSA-C.Cr.P. art. 930.8. We therefore instruct the trial court to inform the defendant of the prescriptive period by sending him appropriate written notice within ten days of this Court’s opinion and to file the written proof in the record of defendant’s receipt of the notice. In all other respects the judgment if the trial court is affirmed.
AFFIRMED.

. State v. Gilkers, 01-K-522 (La.App. 5 Cir. 5/14/01).

. State v. Gilkers, 2001-KK-1400 (La.5/15/01), 792 So.2d 741.

,State v. Gilkers, 2001-KK-1400 (La.5/17/01).

. State v. Gilkers, 01-K-532 (La.App. 5 Cir. 5/16/01).

. State v. Raines, 00-1941 (La.App. 5 Cir. 5/30/01), 788 So.2d 635, 642.

. 98-0398 (La.4/11/00), 776 So.2d 1134, 1149.

. State v. Raines, supra.

. 01-K-522, (La.App. 5 Cir. 5/14/01).

. State v. Gilkers, 2001-KK-1400 (La.5/15/01), 792 So.2d 741.

. State v. Gilkers, 01-K-532 (La.App. 5 Cir. 5/16/01).

. State v. Gilkers, 01-K-532 (La.App. 5 Cir. 5/16/01).

. 550 So.2d 179 (La.1989).

. 365 So.2d 1319 (La.1978).

. 99-994 (La.App. 5 Cir. 1/25/00), 752 So.2d 280, writ denied, 00-0753 (La.2/9/01), 785 So.2d 26.

. 24,103 (La.App. 2 Cir 10/28/92), 606 So.2d 1387, writ denied, 95-2175 (La.2/2/96), 666 So.2d 1091.

. State v. Marse, 365 So.2d at 1323.

. State v. Gilkers, 2001-KK-1400 (La. 5/15/01 and 5/17/01).

.LSA-C.Cr.P. art. 807; See, State v. Marse, 365 So.2d at 1323.